*In re* THOMAS HOULIHAN, Asserted to be a Person Subject to Involuntary Admission (The People of the State of Illinois, Petitioner-Appellee, v. Thomas Houlihan, Respondent-Appellant).

Second District   No. 2—90—1107

Opinion filed July 9, 1992.

William E. Coffin, of Guardianship and Advocacy Commission, of Elgin, and Rosemarie Thurman, of Guardianship and Advocacy Commission, of Chicago, for appellant.

Gary V. Johnson, State's Attorney, of Geneva (William L. Browers and Mary Beth Burns, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE BOWMAN delivered the opinion of the court:

Respondent, Thomas Houlihan, appeals from an order of the circuit court which involuntarily committed him to the Department of Mental Health. On appeal, respondent challenges his commitment on two bases: that the State's noncompliance with the statutory requirements of the Mental Health and Developmental Disabilities Code (Code) (Ill. Rev. Stat. 1989, ch. 91½, par. 1—100 *et seq.*) renders the order of commitment erroneous and ineffective; and that the court's finding of involuntary commitment was not based on clear and convincing evidence.

Respondent was convicted of public indecency (Ill. Rev. Stat. 1989, ch. 38, par. 11—9(a)(2)) and was sentenced to a term of probation. As a condition of that probation, respondent was ordered to undergo a psychiatric evaluation at Riveredge Hospital. Respondent was discharged from Riveredge in July 1990. He then voluntarily entered the Elgin Mental Health Center (EMHC). On August 28, 1990, he requested to be released from the EMHC. The State filed a petition for involuntary commitment on September 5, 1990. Respondent moved to dismiss the petition because it was filed more than five days after his request for release. The trial court agreed and, on September 7, dismissed the petition and discharged respondent. The State immediately filed, in open court, a new petition for involuntary commitment. Respondent requested that the court order his release from the EMHC pending a hearing on the new petition. The court denied respondent's

request. Following a hearing on the second petition, the court found that respondent was a person subject to involuntary commitment. Respondent timely appealed.

Before proceeding to the merits of the appeal, we will address respondent's motion to strike a portion of the State's appellee brief. Respondent argues that, since the State did not appeal from the dismissal of the initial petition, the State cannot argue on appeal that the initial petition was timely filed within the meaning of section 3—403 of the Code (Ill. Rev. Stat. 1989, ch. 91½, par. 3—403) and that this court lacks jurisdiction to consider the merits of that argument. The State counters that because respondent's contention is premised on the invalidity of the initial petition, respondent should be estopped from challenging the State's argument in support of the initial petition.

■■ Estoppel principles are inappropriate when determining whether jurisdiction lies in the appellate court to consider an issue. This is because even if the parties do not contest jurisdiction, the reviewing court has the duty to determine if jurisdiction is lacking and dismiss the appeal. *Ferguson v. Riverside Medical Center* (1985), 111 Ill. 2d 436, 440.

■ The order dismissing the petition was final and appealable since the court dismissed the petition because it was fatally defective. (*Knox v. Keene Corp.* (1991), 210 Ill. App. 3d 141, 144-45.) The court discharged respondent, and the action terminated. The State's failure to appeal deprives this court of jurisdiction to consider the propriety of the dismissal of the initial petition. *Knox*, 210 Ill. App. 3d at 145.

In its appellee brief, the State argues that it could not have appealed the dismissal because the issue would have been moot. We disagree. Two exceptions to the mootness doctrine apply here: the issue is of substantial public importance, and it concerns an event of short duration, capable of repetition, and yet evading review. (*In re A Minor* (1989), 127 Ill. 2d 247, 257-58.) Thus, the State cannot rely on the mootness doctrine to excuse its failure to appeal the dismissal. We therefore grant respondent's motion to strike the portion of the appellee's brief concerning the propriety of the dismissal of the initial petition.

Respondent first contends that the petition for involuntary commitment was ineffective and invalid because it was not filed within five days of his request for release as required under article IV of the Code (see Ill. Rev. Stat. 1991, ch. 91½, par. 3—403) and, therefore, he was entitled to be released from the EMHC. The State responds

that the petition was a proper petition pursuant to section 3—701 of the Code (Ill. Rev. Stat. 1991, ch. 91½, par. 3—701).

This court has not considered this precise issue. There are two divergent trends within the appellate court concerning the proper procedure following a voluntarily admitted patient's request for release to which the State does not timely object. In the first, represented by *In re Shaw*, on which the State relies, the court held that "the mere failure to discharge *** does not necessarily insulate the respondent from subsequent, otherwise-valid involuntary proceedings" pursuant to article VII. (*In re Shaw* (1987), 153 Ill. App. 3d 939, 945.) The second view, as expressed in *In re Guthrie*, rejects the *Shaw* analysis as "inconsistent with the principle that a mandatory requirement of discharge under the Code cannot be circumvented by utilizing other sections of the Code." (*In re Guthrie* (1990), 196 Ill. App. 3d 352, 354.) Our supreme court denied leave to appeal in both causes. We must therefore consider general principles of statutory construction to determine whether the sections of the Code are mutually exclusive. We note, parenthetically, that, unlike in *Shaw* and *Guthrie*, respondent here was discharged.

The goal of statutory interpretation is to give effect to the legislature's intent in drafting the statute. (*Antunes v. Sookhakitch* (1992), 146 Ill. 2d 477, 484.) The best barometer of that intent is the statutory language itself. (*People ex rel. LeGout v. Decker* (1992), 146 Ill. 2d 389, 394.) The court should also consider the purpose of the statutory enactment. *Harvel v. City of Johnston City* (1992), 146 Ill. 2d 277, 283.

■■ Our supreme court discussed the policy behind the voluntary admission sections of the Code in *In re Hays* (1984), 102 Ill. 2d 314. The court interpreted section 3—403 as mandating a voluntarily admitted patient's release within five days of written notice unless an involuntary admission petition is filed. (*Hays*, 102 Ill. 2d at 319.) As the court explained:

> "The rights given voluntarily admitted patients under our code show a legislative intent to encourage voluntary admissions. An important means of encouraging voluntary submission to treatment for mental problems is to grant voluntary patients the right to request their discharge. Of course, the public must be protected from persons dangerous because of mental illness. Accordingly, the Code provides that a voluntary patient who requests discharge may nevertheless be subject to an involuntary commitment if he is deemed to be dangerous to himself or others. Section 3—403 *** provides that in this one instance

an involuntary petition may be brought against a voluntarily-admitted patient within the five-day period prescribed in the statute following his request for discharge." (*Hays*, 102 Ill. 2d at 320.)

In addition, involuntary commitment procedures infringe on a patient's liberty interests, and therefore these statutory sections must be construed strictly in favor of the patient. (*In re Splett* (1991), 143 Ill. 2d 225, 236.) The eloquent discussion in *People v. Valentine* teaches that:

"When we recall that other governments have used involuntary commitment to a mental hospital as a ruse, as a device to silence critics, we feel that this bright line is but one brick in a wall against the evils of tyranny that we, in this country, have erected. One brief glance toward the recent history of Eastern Europe is persuasive of the wisdom of that wall, the wisdom of this rule." (*People v. Valentine* (1990), 201 Ill. App. 3d 10, 13.)

The Code must be employed to balance the liberty interests of those involuntarily committed versus the interest of the public to be safe from mentally ill persons who will engage in violence if released and society's obligation to protect and care for those unable to take care of themselves. (*In re Stephenson* (1977), 67 Ill. 2d 544, 554-55; *People v. Sansone* (1974), 18 Ill. App. 3d 315, 323; see also *In re Williams* (1987), 151 Ill. App. 3d 911, 919.) This balance is fragile, and the statute leaves much room for valid dispute. Although both views are persuasive, we choose to follow *Shaw* rather than *Guthrie* for the following reasons.

First, nothing in the Code indicates that the statutory sections are to be mutually exclusive. *Hays* did not address the interplay between the statutory sections. We cannot rely on the *dicta* in *Hays* that once a voluntarily admitted patient has requested release the State can only commit the patient pursuant to article IV (*Hays*, 102 Ill. 2d at 320), since such a proposition is irrelevant if the faulty article IV petition has been dismissed and the patient has been discharged. The statute is silent regarding the course to follow in a situation such as the one presented by the facts of this cause. Under the general rules of statutory construction, the entire act should be construed as a whole. (*Fumarolo v. Chicago Board of Education* (1990), 142 Ill. 2d 54, 96.) Thus, it appears that the State is not precluded from seeking to admit a person involuntarily under either article VI or article VII (Ill. Rev. Stat. 1991, ch. 91½, pars. 3—600 *et seq.*, 3—700 *et seq.*, respectively) after the voluntarily admitted patient has requested release.

Moreover, the ultimate decision depends on the answer to one question: Should a potentially dangerous individual be released merely because the State filed a petition one day too late? If no remedy existed for the patient, the answer would be yes. Yet, as *Shaw* points out, the patient may file a writ of *habeas corpus* to secure his release (see Ill. Rev. Stat. 1991, ch. 91½, par. 3—905) if the State fails to release him timely. The court should consider the resulting consequences of a decision to construe a statutory section one way versus the other. (*Fumarolo*, 142 Ill. 2d at 96.) The balance is tipped in favor of the public's safety because the patient has another remedy to protect his liberty interest.

Our conclusion is bolstered by *In re Clark* (1991), 220 Ill. App. 3d 1024, 1028. In that case, a voluntarily admitted patient requested discharge, and the State filed a defective article IV petition. The trial court dismissed that petition, yet ordered that the respondent be detained pursuant to article VI (Ill. Rev. Stat. 1991, ch. 91½, par. 3—600 *et seq.*). The article VI petition was defective, so the State filed a proper article VII petition. The appellate court found that the record supported the respondent's temporary detention and the trial court's determination that the invalidity of the second petition did not preclude the State from proceeding on the proper third petition. The court explained, "[i]t would serve no purpose to order the respondent released because he was not examined within 24 hours by another psychiatrist given the filing of the third petition properly supported by two certificates and filed the day before respondent appeared in court to complain of the inadequate second petition." (Emphasis omitted.) *Clark*, 220 Ill. App. 3d at 1028.

We therefore hold that when a voluntarily admitted patient requested release and the State filed its section 3—403 petition more than five days later and that petition was dismissed and the patient was discharged, the patient may still be committed involuntarily if the State follows the proper procedures under section 3—701.

■ Next, respondent contends that the trial court's finding of involuntary commitment must be reversed. For a person to be committed involuntarily, the State must prove, by clear and convincing evidence (Ill. Rev. Stat. 1991, ch. 91½, par. 3—808), that the person is mentally ill and that because of this illness "is reasonably expected to inflict serious physical harm upon himself or another in the near future" (Ill. Rev. Stat. 1991, ch. 91½, par. 1—119(1)). (*Estate of Johnson v. Condell Memorial Hospital* (1988), 119 Ill. 2d 496, 504.) This "clear and convincing" finding must be based on the current condition of the respondent's illness and the future likelihood of harm he might

cause. (*In re Orr* (1988), 176 Ill. App. 3d 498, 505-06.) "[T]he decision to commit must be based upon a fresh evaluation of respondent's conduct and mental state." (*People v. Nunn* (1982), 108 Ill. App. 3d 169, 174.) When reviewing a trial court's order of involuntary commitment, this court must give the lower court's findings great deference, and we will not set aside the order unless it clearly is erroneous. *In re Long* (1990), 203 Ill. App. 3d 357, 362-63.

Because the trial court found more credible the respondent's treating psychiatrist at EMHC, Dr. Jules Michel, we need not detail the testimony of respondent's expert witness. At the hearing on September 21, 1990, Dr. Michel testified that respondent suffered from a schizoaffective disorder, possible substance abuse, and a sociopathic personality disorder. Dr. Michel opined that respondent is a danger to himself and others based on his aggressive and threatening behavior while at the EMHC and his past history of extensive and threatening behavior. The day after his arrival at the EMHC, respondent was denied a razor to shave himself, "and so he inserted his hand through the open window where the nurse dispenses medication and attempted to grab her neck and choke her." Around the end of July, a female patient at the EMHC reported that the respondent attempted to engage her in fellatio. Over the Labor Day weekend, respondent became aggressive and started throwing chairs and fighting with the security staff when they attempted to restrain him. We note that the court, in finding that respondent presented a danger to himself and others, mentioned the choking and fighting incidents but failed to mention the fellatio occurrence.

Respondent argues that evidence relating to the choking and fighting incidents with the staff did not rise to the required clear and convincing level of proof. He attacks only the weight to be afforded such evidence, not its admissibility. Specifically, respondent claims that Dr. Michel's sole knowledge of the incidents was derived from EMHC's medical history records, that the nurse involved in the choking incident failed to testify, and that testimony about the fighting incident was too vague and general. We find respondent's argument without merit. A patient's psychiatric history is one of the most important criteria in making a diagnosis. (*People v. Anderson* (1986), 113 Ill. 2d 1, 8.) Any psychiatric history would be incomplete and unreliable if it did not include the observations of nurses, social workers, and other personnel at the hospital where the patient has received psychiatric treatment. (See *In re Germich* (1981), 103 Ill. App. 3d 626, 629.) Respondent points out that Dr. Michel offered conflicting testimony about the choking incident. On cross-examination, Dr. Mi-

chel admitted that because he was not present when the choking incident occurred, he could not be certain whether respondent was possibly attempting to grab some item other than the nurse's neck. We fail to see how this speculative response concerning a mere possibility could in any reasonable manner affect the weight to be accorded Dr. Michel's testimony concerning the choking incident.

In support of his argument that evidence of the fighting incident is too vague and general, respondent relies on *People v. Cutsinger* (1989), 186 Ill. App. 3d 219. Therein, a physician testified that Cutsinger was mentally ill and presented a danger to himself and others because he was loud, angry, used abusive language, threatened to call politicians, and advanced towards people when he became angry. (*Cutsinger*, 186 Ill. App. 3d at 226.) This court found the behavior described, although offensive, was not evidence that he intended to harm anyone or himself because he had not physically threatened or harmed anyone, or even made gestures to harm anyone. (*Cutsinger*, 186 Ill. App. 3d at 226.) Based on these facts, this court held that there was an insufficient factual basis to involuntarily commit Cutsinger. 186 Ill. App. 3d at 227.

We find the facts in respondent's case distinguishable from *Cutsinger*. Unlike *Cutsinger*, respondent committed overt acts which could be reasonably intended to cause harm to other persons or himself. These acts included the attempted choking of a hospital employee, throwing chairs, and fighting with the security staff. In addition to the choking and fighting incidents, Dr. Michel's opinion that respondent is a person reasonably expected to inflict serious harm upon himself or another in the near future included respondent's criminal history. Dr. Michel testified that respondent's criminal behavior reaching back to 1981 was consistent with his mental illness. The history included a charge of rape, which was plea bargained to a lesser charge, a sexual exposure conviction for which he is currently on probation, and an unspecified burglary offense.

Based on the evidence presented, we cannot say that the trial court's finding that the defendant is reasonably expected to inflict serious physical harm upon himself or another in the near future is manifestly erroneous.

The decision of the circuit court of Kane County is affirmed.

Affirmed.

NICKELS and DOYLE, JJ., concur.