February 9, 1999

No. 2-98-0154

_________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_________________________________________________________________

In
 
re
 ROBERT H., Alleged to ) Appeal from the Circuit Court

be a Person Subject to ) of McHenry County.

Involuntary Admission )

)

) No. 98--MH--2

)

)

(The People of the State of )

Illinois, Petitioner- ) Honorable

Appellee, v. Robert H., ) Haskell M. Pitluck,

Respondent-Appellant). ) Judge, Presiding.

_________________________________________________________________

JUSTICE THOMAS delivered the opinion of the court:

Following a bench trial in the circuit court of McHenry County, respondent, Robert H., was found to be a person subject to involuntary admission and was ordered to be hospitalized at the Northern Illinois Medical Center (NIMC).  Robert timely appeals the trial court's order, contending (1) that the trial court committed reversible error in allowing evidence that he had shot his neighbor 20 years earlier while mentally ill; and (2) that the trial court's order must be reversed because the State did not present evidence, nor did the trial court consider, whether involuntary admission was the least restrictive alternative.

The following testimony was adduced at trial.  Respondent's wife, Sharon H., testified that she and Robert had been married for 34 years.  Sharon said that, in the two weeks prior to the time Robert was brought to the hospital, Robert was not sleeping much, was not eating, and was not shaving or washing.  Robert also had asked her if someone could have poisoned the water supply to their house and asked if someone could have poisoned the food in their refrigerator.  In addition, a few days prior to his admission to the hospital, Robert told her that he had gone past her room and that it was all lit up.  Robert claimed that someone had pushed him down the stairs and also said that "they" were burning out Sharon's eyes and trying to make holes in them.

Sharon said that Robert did not threaten her but that he told her there was a conspiracy to try to get him out of Spring Grove and that she might be involved with the conspiracy.  Robert also told her that, if she saw tapes of him doing "bad things," he was not aware of what he had done because someone had given him the "date rape" drug, Rohypnol.  Robert had seen an Oprah show on Rohypnol where people said that they had no recollection of things they had done while under the influence of the drug.  Robert warned Sharon not to leave her can of pop unattended at work because someone might try to put Rohypnol in it.  Sharon said that Robert was talking to her in a strange little voice which was different from his usual tone.  He also told her that the neighbors might be involved in the conspiracy.  

Sharon said that she was very worried because she had seen this pattern before where Robert did not trust anyone and was very fearful.  Over the objection of Robert's counsel, Sharon testified that 20 or 21 years earlier Robert also was not sleeping, was not cleaning himself, and would not eat food from the refrigerator because he thought it had been poisoned.  This behavior went on for several weeks.  Robert also accused Sharon of having a boyfriend.  One Saturday morning, while the woman who lived above them was at work, Robert went to their apartment and Sharon heard a "pop, pop, pop noise."  Robert had shot the man who lived above them.  Robert's counsel again objected to the testimony, but the trial court overruled the objection, stating it was relevant to show that Sharon now was seeing the same pattern.  Sharon said that Robert was put into Chester Mental Health Center for 72 hours and was given Thorazine.  The only time Robert took medication was when he was in Chester.

Sharon testified that the week before Robert was admitted to the hospital she discovered that he had a gun.  She and Robert were going downtown with their son when she saw Robert stick something in his coat pocket.  She pulled it out and saw that it was a cylinder.  She asked Robert what it was, and he said it was something for cars.  She then realized it was for a gun and hid it.  She also said that the last night Robert was home she heard some clicks outside her bedroom door and realized he had another gun.  

On cross-examination, Sharon said that after the incident 20 years earlier Robert had received treatment at the Isaac Ray Center.  Sharon said that after Robert was hospitalized she confirmed that he did have a second gun in the house.  On the last evening that Robert was home, he had wedged things under the front and back doors, presumably so that no one could open them.  Sharon said that, when the sheriff's police told Robert that she wanted him to go to the hospital, he agreed.   

Dr. Elizabeth McMasters then testified as an expert witness.  Dr. McMasters said that she was on staff at NIMC and had examined Robert there after his admission to the hospital and had spoken with him on two or three occasions afterward.  Since that time, Robert had refused to speak with her.  Dr. McMaster's diagnosis of Robert was that he had a delusional disorder, persecutory type, which is a mental disorder in which a person becomes convinced of situations or beliefs that are not real and is convinced that he is the center of some kind of persecution.  The basis for her diagnosis was a conversation she had with Robert in which he told her that there was a conspiracy against him which might involve the Lake County and the McHenry County police, that a friend and some neighbors might be involved in the conspiracy against him, that he may have been videotaped engaging in sexual acts, and that the videotape was going to be used to blackmail him.  Robert wanted to protect himself because of the conspiracy, so he began purchasing burglar alarms and locks.  He also thought he had acquired a venereal disease and requested some tests for venereal disease.  Robert told a nurse at NIMC that a technician in a hospital had rubbed his arm with a pencil, which had transmitted a venereal disease.  Robert told another staff member that he felt that the  leader of a group therapy session had a hypnotic voice, so he decided to leave the group.  Dr. McMasters said that she was very concerned that Robert might harm another person in an act of self-

defense due to his extreme paranoia.  Dr. McMasters did not rely on Robert's past history in making her diagnosis, although his past behavior made her concerned about his future behavior.  Dr. McMasters said that, with an antipsychotic medication to target his delusional beliefs, Robert's prognosis was fair.  Dr. McMasters felt that Robert was in need of immediate hospitalization and that there were no less restrictive alternative treatments available.  

On cross-examination, Dr. McMasters said that originally she told Robert that he was going to be discharged.  The NIMC nurses called Robert's wife to come and pick him up, but, when she arrived, they decided to keep Robert at the hospital.  Dr. McMasters explained that she had spoken with Robert's wife right after Robert was admitted and told her there was a potential for harm, but Robert's wife did not express grave concern if Robert came home.  However, when she came to pick Robert up, she was extremely distraught and the staff did not feel comfortable allowing Robert to leave with her.  Dr. McMasters then consulted with another doctor and decided to keep Robert at NIMC.  

Dr. McMasters said that Robert did not threaten anyone at the hospital, did not threaten her, and never indicated that he would hurt himself.  Dr. McMasters testified that she was concerned that Robert might perceive someone as a threat and harm that person.  Dr. McMasters also said that Robert had expressed a strong interest in keeping his firearms, which she said made him a more imminent threat to others. 

Robert then testified on his own behalf.  He said that he had watched an episode of Oprah concerning people who had been given certain drugs and then had been photographed in various sex acts but did not remember anything after the drugs wore off.  Robert began to wonder if this had happened to him because he had some strange memories.  Robert also said that one morning his wife awoke and told him how bad her eyes were.  Robert looked at her eyes and saw that they were all bloodshot, which jarred a memory from the night before.  Robert remembered that someone was in the house and had pushed him down the stairs with a "policeman's push."  He saw an entranceway which was all lit up.  Robert said his memories were a "touch stronger than a dream."  

Robert said that his state of mind was not the same as it had been 20 years earlier because 20 years earlier he knew he was "bad off" and knew that he was out of touch with reality.  Robert believed there was a conspiracy, which was one of the reasons he had changed the locks on his doors.  He could not say who the conspirators were other than that the police were involved.  He said that he did not want to do the conspirators any harm and did not want to harm himself because of the conspiracy.  

Robert said that he had agreed to go to NIMC because he thought he would be let go after a quick evaluation.  Robert said that he had talked to other psychiatrists before and felt that Dr. McMasters was relatively inexperienced.  Robert had spent time in Chester Mental Health Center and about a year at Reed before going to Isaac Ray Center on an outpatient basis.  Robert said that the police had been concerned because he had a pocket knife and a gun clip on him when he was admitted.  Robert tried to explain to Dr. McMasters that he was carrying the gun clip in order to disarm his gun at home.  At the time, Robert had a valid firearm owner's identification (FOID) card.  Robert said that he did not want to stay at the Medical Center.  He did not believe that he was a threat to other people or a threat to himself.

On cross-examination, Robert said that he had told his wife to watch her things because the Oprah show had revealed how easy it was to become a victim of a Rohypnol drugging.  Robert did not believe that he had given "any kind of serious consideration" to whether his food was poisoned and said whatever problem there had been with his water supply had been remedied by using distilled water to make coffee.  Robert said that it was a possibility that the McHenry County police were involved in the conspiracy, although he had no proof of that.  He did not know if the Lake County police were involved.  Robert also explained that he had heard from a staff member at NIMC that, because doctors went into his bowel during an emergency operation, he could have contracted herpes.  Robert said that the leader of a group session at NIMC had a hypnotic voice, and Robert felt that the effect of his voice was to open the patients up for hypnotic suggestion.  

Robert said that he had owned handguns for quite awhile and that he had once owned five handguns, two of which had been lost.  Robert admitted that he had concealed his guns from his wife because he did not want to upset her.  Robert said that he had the clip from his handgun in his pocket when he was admitted because he had removed the clip in order to deactivate the gun.  Robert denied that when his wife found the clip in his pocket he told her that it was a car part.  Robert said that he thought the conspiracy was to take his FOID card from him.  

The trial court then ruled that the State had proved by clear and convincing evidence that Robert suffered from a mental disease.  The trial court also said that, while it did not think Robert would intentionally harm anyone, the court believed Robert could be dangerous to others if he perceived he was acting in self-defense with regard to the conspiracy.  The trial court also said that it did not feel that there was any alternative to treatment other than commitment to a mental facility.

On appeal, Robert does not challenge the trial court's finding that he suffered from a mental disease.  Rather, Robert first contends that the trial court committed reversible error in allowing evidence of his actions 20 years earlier to show that he was likely to harm someone in the future.  Robert claims that the evidence was improperly admitted to prove that he had a propensity for violence and also argues that any probative value such evidence might have is outweighed by its prejudicial impact. 

Pursuant to statute, a person subject to involuntary commitment is "[a] person with mental illness and who because of his or her illness is reasonably expected to inflict serious physical harm upon himself or herself or another in the near future."  405 ILCS 5/1--119(1) (West 1996).  A finding that a person is subject to involuntary commitment must be based upon clear and convincing evidence.  405 ILCS 5/3--808 (West 1996).  The clear and convincing evidence must be based upon the current condition of a respondent's mental illness and the future likelihood of harm that the respondent might cause.  
In re Houlihan
, 231 Ill. App. 3d 677, 682-83 (1992).  A decision to commit a respondent requires a fresh evaluation of his mental state and conduct.  
Houlihan
, 231 Ill. App. 3d at 683.  This court must give great deference to the finding of the trial court and should not set aside the trial court's order unless that order is clearly erroneous.  
Houlihan
, 231 Ill. App. 3d at 683.  

Robert argues that only evidence of his current mental condition and his future likelihood of harm were relevant to determining whether he was subject to involuntary admission, and, therefore, the trial court should not have admitted evidence that he had shot his neighbor 20 years earlier.  Robert also argues that the evidence concerning his behavior 20 years earlier was admitted only to show his propensity for violence.  Robert notes that in both criminal and civil cases evidence of a defendant's wrongful acts cannot be admitted to show that a defendant has acted, or is likely to act, in that same way again.  

It is true that in criminal cases evidence of a defendant's prior acts of misconduct is inadmissible if introduced only to establish the defendant's propensity to commit crime.  
Thompson v. Petit
, 294 Ill. App. 3d 1029, 1034 (1998).  Similarly, in civil cases, proof of one wrongful act by the admission of evidence of another such similar tortious or wrongful act is prohibited, unless the evidence concerning the prior wrongful act is admitted to establish purpose, intent, motive, knowledge, or the mental state of the party.  
Thompson
, 294 Ill. App. 3d at 1035.  However, in determining a respondent's dangerousness for purposes of involuntary commitment, evidence of a respondent's prior hospitalization and the facts underlying that hospitalization are relevant factors to consider.  
People v. Washington
, 167 Ill. App. 3d 73, 79 (1988). It is proper for an expert witness to examine a respondent's complete psychiatric history in forming his opinion concerning the respondent's current and future dangerousness.  
In re Barnard
, 247 Ill. App. 3d 234, 257 (1993).  A commitment order should be affirmed where there is evidence of prior conduct along with evidence that the respondent remains in need of mental treatment.  
In re Orr
, 176 Ill. App. 3d 498, 505 (1988).  

As noted by the State, Robert was not charged with a crime, nor was he involuntarily committed because he had committed a crime.  Robert was admitted because the trial court found that Robert was reasonably expected to inflict serious physical harm upon another in the near future due to his mental illness.  Accordingly, evidence that Robert shot his neighbor 20 years earlier while mentally ill was not admitted improperly as other crimes evidence but rather was properly admitted as part of Robert's complete psychiatric history.  Further, while the State must show that a respondent is subject to involuntary commitment based upon the current condition of his mental illness and the future likelihood of harm that the respondent might cause, evidence concerning Robert's prior conduct and hospitalization was, as noted, relevant to determining his dangerousness for purposes of involuntary commitment.  See 
Washington
, 167 Ill. App. 3d at 79.  Therefore, the trial court properly allowed into evidence testimony that Robert had shot his neighbor 20 years earlier while mentally ill.

We also do not find that the probative value of the evidence that Robert shot his neighbor is outweighed by the prejudicial value.  Robert argues that the evidence has little or no relevance to his current condition because it happened 20 years earlier.  In support of his argument, Robert notes that the supreme court has recognized in an involuntary commitment case that "there may well be a point where the lapse of time has been so great that the probative value of prior conduct has diminished to irrelevancy."  
In re Stephenson
, 67 Ill. 2d 544, 563 (1977).  Nonetheless, we do not believe the 20-year-old incident at issue here is so disassociated from the case before us that it is irrelevant.  

Based upon the record, prior to the current episode of mental illness, Robert had suffered only one prior episode of mental illness 20 years earlier.  Robert's wife testified that she became worried because she began observing the same behavior in Robert that she had seen 20 years earlier.  She testified that, 20 years earlier and currently, Robert was not sleeping or cleaning himself and believed that his food had been poisoned.  In both instances, Robert had become increasingly paranoid.  The question of whether to exclude evidence because it is too remote in time to be relevant must be made on a case-by-case basis.  
Thompson
, 294 Ill. App. 3d at 1038.  Given the parallels between Robert's current behavior and his behavior 20 years ago, we cannot say that the length of time between the incidents rendered the prior incident irrelevant. 

Nor do we find the evidence that Robert had shot his neighbor 20 years ago to be unfairly prejudicial.  " 'Unfair prejudice' is the capacity of relevant evidence to lead the fact finder to a decision on an improper basis * * *."  
Thompson
, 294 Ill. App. 3d at 1036.  As discussed, a respondent's prior hospitalization and the facts underlying that hospitalization are proper bases upon which to determine a respondent's dangerousness for purposes of involuntary commitment.  
Washington
, 167 Ill. App. 3d at 79.  The evidence, therefore, was not unfairly prejudicial.  The trial court  did not err in admitting evidence concerning Robert's behavior 20 years earlier.

Robert next argues that the State and the trial court failed to comply with section 3--811 of the Mental Health and Developmental Disabilities Code (the Code) (405 ILCS 5/3--811 (West 1996)) because there was no evidence that involuntary commitment was the least restrictive alternative available in this case.  Robert notes that the State did not prepare a written predispositional report as required by section 3--810 of the Code (405 ILCS 5/3--810 (West 1996)) and did not present oral testimony to compensate for the lack of a report.  Robert contends that because the trial court did not consider a predispositional report the trial court's order must be reversed.

Section 3--810 of the Code provides as follows:

"Before disposition is determined, the facility director or such other person as the court may direct shall prepare a written report including information on the appropriateness and availability of alternative treatment settings, a social investigation of the respondent, a preliminary treatment plan, and any other information which the court may order. * * * If the respondent is found subject to involuntary admission, the court shall consider the report in determining an appropriate disposition."  405 ILCS 5/3--810 (West 1996).

Section 3--811 of the Code provides that if a person is found subject to involuntary admission, "the court shall consider alternative mental health facilities which are appropriate for and available to the respondent, including but not limited to hospitalization."  405 ILCS 5/3--811 (West 1996).

The supreme court has ruled that section 3--810 of the Code  requires a written predispositional report.  
In re Robinson
, 151 Ill. 2d 126, 132-33 (1992).  However, when a respondent fails to object to the absence of a written predispositional report, oral testimony containing the information required by statute can be an adequate substitute for the formal written report.  
Robinson
, 151 Ill. 2d at 134.  In this case, Robert did not object to the absence of a written predispositional report, so we must determine whether the testimony at trial was sufficient to satisfy the purposes of section 3-810 of the Code.  

Robert contends that the oral testimony did not contain the information required by statute because Dr. McMasters was never asked the basis for her opinion that hospitalization was the least restrictive alternative available, nor did she list which alternatives to inpatient treatment had been explored.  Upon review of the record, however, we disagree that the oral testimony did not contain information concerning the least restrictive alternatives.  Dr. McMasters testified that there were no less restrictive alternative treatments to immediate involuntary hospitalization.  Later, Dr. McMasters testified that she originally had decided to send Robert home because she felt that Robert's wife was comfortable with having him home and contacting the police if she felt the threat of harm was imminent.  Dr. McMasters then reconsidered her decision to send Robert home because Robert's wife was very distraught when she came to pick Robert up.  Dr. McMasters consulted with another doctor and changed her mind about sending Robert home.  In addition, Robert's strong interest in keeping his guns was significant to Dr. McMaster's decision because it made Robert even more of an imminent threat.  The trial court clearly considered this testimony, as it found that involuntary admission was the least restrictive alternative in this case.

In reaching our decision, we are guided by the supreme court's decision in 
Robinson
, 151 Ill. 2d 126.  There, the supreme court held that the oral testimony contained the information required in a predispositional report, including information about the appropriateness and availability of alternative treatment settings, where the State's expert testified that involuntary admission would be the least restrictive environment for the respondent because his admission would ensure that the respondent would not go out drinking when he became angry and frustrated.  
Robinson
, 151 Ill. 2d at 135.  Likewise, in this case, it is clear from the testimony that involuntary admission was the least restrictive alternative for Robert because his wife did not want him at home and his admission would ensure that he did not have access to guns if the threat of harm was imminent.  In the absence of a trial objection by Robert, the testimony of Dr. McMasters made sufficient reference to the appropriateness and availability of alternative treatment settings for purposes of sections 3--810 and 3--811 of the Code.   Accordingly, we affirm the trial court's order of involuntarily commitment.

For all of the foregoing reasons, the judgment of the circuit court of McHenry County is affirmed.

Affirmed.

BOWMAN, P.J., and HUTCHINSON, J., concur.