2021 IL App (2d) 190373-U
No. 2-19-0373
Order filed September 24, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16-CF-1202 |
| HENRY VAZQUEZ, | ) ) | Honorable T. Clint Hull, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Presiding Justice Bridges and Justice Hudson concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The trial court's involuntary commitment of defendant was not against the manifest weight of the evidence; the evidence supported the court's conclusion that defendant suffered from mental illness and posed a serious threat to public safety.

¶ 2     Following an evidentiary hearing, the trial court committed defendant, Henry Vazquez, to the custody of the Department of Human Services (DHS) pursuant to section 104-25(g)(2) of the Code of Criminal Procedure (Code) (725 ILCS 5/104-25(g)(2) (West 2016)). Defendant appeals, and contends that the judgment was against the manifest weight of the evidence. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     On July 17, 2016, defendant, then 23 years old, was arrested and charged with six offenses including two counts of aggravated battery (victim over 60; public way) (720 ILCS 5/12-3.05(c), (d)(1) (West 2016)), two counts of domestic battery (720 ILCS 5/12-3.2(a) (West 2016)), one count of battery (720 ILCS 5/12-3(a)(2) (West 2016)), and one count of resisting or obstructing a peace officer (720 ILCS 5/31-1(a) (West 2016)). The charges stemmed from an incident where defendant began punching his father, Enrique, while Enrique was driving them both in Elgin.

¶ 5     At defendant's arraignment, his attorney raised a *bona fide* doubt regarding defendant's fitness to stand trial. On August 31, 2016, the parties stipulated to a report by the Kane County Diagnostic Center (KCDC). The report indicated that defendant presented with poor hygiene and did not understand why he was in jail. Defendant could not provide much of his social history or personal information. Defendant reported that he was diagnosed with a mental health condition at age 7 but could not recall the diagnosis. He stated that he was taking "Seroquel and stuff like that." Defendant stated he did not like to shower because "shampoo is weird." Defendant abruptly ended the first interview and demanded to have his attorney present.

¶ 6     During a second interview, with counsel present, defendant was unable to recognize his public defender, even though they had met a month earlier. Defendant began to insist that his public defender was not "a real attorney" and that "they"—meaning the KCDC staff—had given him "sugar pills" instead of medications. This interview ended abruptly as well. During a third interview, defendant spoke in a low volume and his speech was slurred to the point of being unintelligible. Defendant stated that he was in jail but could not identify the month, day, or season. At one point, defendant said the season was "cold outside"—however, it was August, and the weather was warm. The report noted that defendant was often guarded and mumbled, occasionally volatile, and particularly suspicious of his medication, soap, and showers. KCDC's staff

psychiatrists diagnosed defendant with schizophrenia (unspecified), and he was given Haldol (an antipsychotic) and Cogentin (an anti-convulsant, for tremors).

¶ 7    After receiving the parties' stipulation, the trial court (Judge Linda Abrahamson) found defendant unfit to stand trial. The court noted that defendant was uncooperative in the courtroom and did not appear oriented to the time, place, or circumstances. The court found it was clear defendant did not understand the charges against him, the possible penalties, the roles of individuals in the courtroom, or how to work appropriately with his attorney. The court committed defendant to DHS for a treatment plan and possible restoration to fitness.

¶ 8    DHS placed defendant in Elgin Mental Health Center (EMHC). On October 16, 2016, the court received a report indicating defendant had not made much progress at EMHC. It was reported that defendant was still suffering from acute psychosis "characterized by illogical thinking, paranoid and persecutory delusions, [and] auditory hallucinations." Defendant often refused to leave his cell and had been observed talking loudly to himself and "responding to internal stimuli."

¶ 9    On November 1, 2016, defendant was transferred to Chester Mental Health Center, a maximum security, forensic facility. Defendant consented to receive medication and a treating psychiatrist, Dr. Terrence Casey, opined that there was a substantial likelihood defendant could be restored to fitness within one year. Casey noted however that defendant remained acutely psychotic, confused, and disoriented. He also refused to follow directions which led to harmful behavior towards himself and aggressive behavior towards others. A subsequent report noted that on November 6, 2016, defendant struck a staff member and had to be placed in restraints. Defendant was also sexually inappropriate with female staff, asking them to come into his room and "show me something" and telling them "you're beautiful."

¶ 10    Defendant's treatment plan noted that defendant did not understand why he was at Chester and denied the charges against him. The report noted that defendant suffered from a serious mental illness, that defendant's "confusion and psychosis interfere[ed] with his ability to listen and follow directions[,]" and that defendant needed to "learn how to interact with others in a less aggressive manner."

¶ 11    By January 2017, defendant appeared to have made some progress and was now taking Haloperidol (an antipsychotic), Lorazepam (for anxiety), Trazadone (for insomnia), and Oxcarbazepine (a mood stabilizer).

¶ 12    Dr. Casey's report in April 2017 indicated that defendant had made additional progress and was medication compliant. Staff reported that defendant was generally "calm and cooperative" but remained "internally preoccupied." In July 2017 Casey noted defendant continued to improve but declined to participate in "fitness education," which would assist him with understanding basic court proceedings.

¶ 13    Casey next reported in September 2017 that defendant had only made minimal progress. Due to "increased behaviors" defendant's medication doses were likewise increased; defendant remained compliant with taking his medications but was generally noncompliant with staff requests and remained aggressive towards staff and peers. Defendant continued talking to himself, though not as much, and appeared to experience auditory hallucinations less frequently. Still, Casey found that defendant remained confused about the circumstances surrounding his arrest and about court proceedings. In Casey's view, defendant lacked the capacity to assist in his own defense. Casey ultimately opined that defendant continued to require inpatient psychiatric treatment because defendant remained unfit in the year following the initial unfitness finding (see

725 ILCS 5/104-23 (West 2016)), and there was not a substantial probability that defendant would attain fitness.

¶ 14    At a discharge hearing (725 ILCS 5/104-25 (West 2016)), defendant's father testified regarding the attack in Elgin on the night of July 17, 2016. Enrique was driving and defendant threw some trash out of the car window. Enrique asked defendant why he did that and said something to defendant about how he looked like "Uncle Juan ***." At that point, defendant became irate and started punching his father. Enrique stopped the car on the shoulder of the offramp in Elgin on Route 20. Enrique got out of the car; defendant followed and continued to hit him as Enrique yelled for someone to call the police. Another driver stopped, called the police, and defendant was taken into custody after a brief struggle. Enrique had a bloody lip and injuries to the right side of his face. After the close of evidence and arguments, the trial court found defendant "not not guilty" of one count aggravated battery (public way), two counts of domestic battery, and resisting and obstructing a peace officer. (The court acquitted defendant of aggravated battery (victim over 60) after finding that the State failed to prove that defendant knew his father's age.) Because the most serious offense, aggravated battery, was a Class 3 felony (see 720 ILCS 5/12-3.05(c), (h) (West 2016)), the court extended defendant's commitment for a period of 15 months, unless he was restored to fitness sooner. See 725 ILCS 5/104-25(d)(1) (West 2016).

¶ 15    Following the discharge hearing, the court continued to receive reports every 90 days from Dr. Casey who noted that defendant had made minimal progress in inpatient treatment. Defendant continued to experience auditory hallucinations and failed to manifest a basic understanding of his situation. Casey consistently reported that defendant lacked insight into his aggressive behavior, continued to experience auditory hallucinations, and demonstrated minimal progress or willingness to become fit.

¶ 16    The State then sought defendant's extended commitment on the grounds that defendant was a "serious threat to public safety[,]" (see *id.*) and a hearing was held on March 13, 2019. The parties stipulated to Dr. Casey's qualifications as an expert in forensic psychiatry and Casey's February 2019 report was admitted by stipulation as well. In this report, Casey outlined defendant's criminal history as well as five recent "episodes of acute instability and violence" while at Chester. Of significance, Casey discussed an incident in September 2014 where defendant was arrested in Cook County for aggravated criminal sexual abuse and aggravated battery (victim over 60).

¶ 17    The court received in evidence a certified copy of conviction for aggravated battery and the felony minutes related to this incident. In sum, defendant accosted a 63-year-old woman as she arrived to their apartment building carrying groceries. Defendant smacked the victim on her buttocks and took her groceries. Frightened, the victim ran up the stairs to her apartment; defendant followed her and cornered her and attempted to kiss her. Defendant asked her for a kiss and when she refused he asked her for sex and then offered her money to perform a sex act. The victim repeatedly said no and told defendant she was married. Defendant then grabbed the victim's left breast over her clothing. Defendant was sentenced to probation.

¶ 18    Returning to Dr. Casey's final report, Casey noted that defendant failed to appreciate the consequences of the Cook County incident as well as the Elgin incident involving his father and the police. In particular, Casey noted that defendant was particularly likely to lash out at victims who were "especially vulnerable," like the elderly. Regarding the incident with his father, defendant acknowledged that he hit Enrique because he was hungry and wanted food. Casey further noted four incidents at Chester where defendant was placed in restraints "as a result of severe physical violence." Casey concluded that defendant's cognitive impairments and

psychiatric condition could not be effectively managed with medication and would also cause him to discontinue psychotropic medication in an outpatient setting. Casey's report concludes as follows:

> "[Defendant] requires the support and environmental cues provided in the inpatient psychiatric setting. He does not currently demonstrate self-care skills necessary to reintegrate into the community. If released [defendant] would attempt to meet his needs without regard for the welfare of others, and would engage in violent behaviors that would pose a risk of immediate harm to himself and to others.
>
> **OPINION:** [Defendant] does not yet possess adequate knowledge of basic court proceedings. Nor does he have a thorough understanding of his charges, including the seriousness of the charges and potential penalties if convicted. He does not demonstrate the capacity to assist in his own defense. It is the clinical opinion of his treatment team that he is **Unlikely to Attain Fitness Stand Trial.**
>
> Additionally *** [w]ithout the support of the inpatient psychiatric setting, he would be unable to provide for his basic physical needs so as to guard himself from serious harm."

¶ 19    After the close of evidence, the State argued that defendant was violent, impulsive, and a serious threat to public safety. The defense argued that the State's evidence failed to show his illness was "severe enough" to constitute a serious threat.

¶ 20    The trial court found that the State had proved by clear and convincing evidence that defendant should be involuntarily committed. The court determined that defendant had not been restored to fitness and that he could not be without significant assistance. The court then determined that defendant posed a serious threat to the public's safety. While the court gave little weight to the incidents that occurred at Chester, for which the court had limited information, the

court observed that the evidence against defendant indicated that he had committed violent offenses and was impulsive.

¶ 21     The trial court found that defendant was eligible for an extended term sentence based on his prior conviction for aggravated battery, but it nevertheless ordered that defendant be committed for a period not to exceed five years from the date of his arrest. The State, however, filed a motion to reconsider, pointing out that the Code requires the court to order "[a] period of commitment equal to the maximum sentence to which the defendant would have been subject had he or she been convicted in a criminal proceeding." 725 ILCS 5/104-25(g)(2); see also *id.* § (g)(4). The trial court then granted the State's motion, and set the maximum commitment date at 10 years. Accordingly, defendant's term date was set at July 12, 2026. Defendant appeals.

¶ 22                                             II. ANALYSIS

¶ 23     Defendant contends that the trial court's order involuntarily committing him was against the manifest weight of the evidence. The State argues that the evidence was more than sufficient. We affirm.

¶ 24     Defendant was involuntarily committed pursuant to section 104-25(g)(2) of the Code during the pretrial phase of his criminal case. "A defendant is unfit if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense." 725 ILCS 5/104-10 (West 2016). In addition, section 104-25(g)(2) of the Code provides:

> "If the defendant continues to be unfit to stand trial, the court shall determine whether he *** is subject to involuntary admission under the Mental Health and Development Disabilities Code or constitutes a serious threat to the public safety." *Id.* § 104-25(g)(2).

Accordingly, the State must prove by clear and convincing evidence that the defendant (1) suffers

from a mental condition and (2) constitutes a serious threat to public safety.

¶ 25    As the parties acknowledge, "[t]he standard of review for an involuntary-commitment proceeding is whether the judgment is against the manifest weight of the evidence." *In re Shirley M.*, 368 Ill. App. 3d 1187, 1194 (2006). Under the manifest-weight standard, we are required to give great deference to the trial court's factual findings, and may not substitute our judgment for that of the trial court regarding the weight to give evidence or the inferences to be drawn. *People v. Guerrero*, 2012 IL 112020, ¶ 19; *In re Bennett*, 251 Ill. App. 3d 887, 888 (1993); *In re Houlihan*, 231 Ill. App. 3d 677, 682-83 (1992). A judgment is against the manifest weight of the evidence "only if 'the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented.' " *People v. Relwani*, 2019 IL 123385, ¶ 18 (quoting *People v. Deleon*, 227 Ill. 2d 322, 332 (2008)).

¶ 26    Defendant does not challenge the trial court's finding that he is mentally ill; rather, defendant asserts that there was insufficient evidence that he is a serious threat to public safety requiring commitment. Defendant's argument largely consists of picking apart the evidence in Dr. Casey's reports. Of the incidents that occurred when defendant first arrived at Chester in November 2016, defendant posits that these events occurred "likely before he would have been able to be stabilized by medication ***." Defendant protests that Casey's treatment reports were too vague, and used words like "aggressive," "uncooperative," "acute instability" and "increased behaviors" without describing the events that formed those conclusions. Defendant also complains that Casey's reports (and therefore, his testimony) were based on hearsay reports from defendant's "treatment team" and not from Casey's personal observations. Defendant cites our decision in *In re Cutsinger*, 186 Ill. App. 3d 219 (1989), wherein we recited the proposition that "explicit medical testimony" (internal quotation marks omitted) is required to find that a person is a serious danger

to himself or others to justify involuntary commitment. *Id.* at 223.

¶ 27    Although our decision in *Cutsinger* applied to involuntary commitment under the Mental Health Code rather than unfitness proceedings under the Criminal Code, there is no danger in applying the "explicit medical testimony" standard here. Dr. Casey is a forensic psychiatrist—*i.e.*, a physician—and he *explicitly* stated in his stipulated testimony his opinion that defendant was unfit to stand trial, suffered from a mental illness, and constituted a serious threat to public safety.

¶ 28    Furthermore, while defendant complains that Casey's reports were based, in part, on hearsay, we find nothing improper. Under Illinois Rule of Evidence 703 (eff. Jan. 1, 2011), Dr. Casey (an expert witness) was entitled to base his opinion on defendant's records and the reports of others as those are reasonably relied upon by experts in the field of forensic psychiatry. As we have said before, any report on the defendant's psychiatric condition "would be incomplete and unreliable if it did not include the observations of nurses, social workers, and other personnel at the hospital where the patient has received psychiatric treatment." *In re Houlihan*, 231 Ill. App. 3d at 683. Accordingly, "a treating psychiatrist's opinion *** need not be derived from firsthand observations *** and may be based on knowledge of incidents derived from medical history records." *In re Lisa G.C.*, 373 Ill. App. 3d 586, 594 (2007) (citing *In re Houlihan*, 231 Ill. App. 3d at 683). Moreover, under Illinois Rule of Evidence 705 (eff. Jan. 1, 2011), Dr. Casey was entitled to give his opinion without disclosing the facts underlying his opinion. See generally *Wilson v. Clark*, 84 Ill. 2d 186, 194 (1981). Accordingly, the time for defendant to challenge Dr. Casey's testimony, or to test it through cross-examination, has long since passed and it is not our province to reweigh the evidence.

¶ 29    Defendant's final point is that both of his criminal cases were probationable offenses. He asserts that, "[t]he conduct in those cases, while serious, is not conduct that would require the

defendant to be locked up for ten years with no good time [credit] as a serious threat to the public safety." This assertion misses the mark. Defendant has *not* been convicted in this case (*People v. Mayo*, 2017 IL App (2d) 150390, ¶ 3) and has not been sentenced to prison. Instead, he has been committed, albeit against his will, to a mental health facility after having been *discharged* from criminal process. Defendant is in a fundamentally different position than a criminal defendant who has been convicted and sentenced. See *People v. Williams*, 142 Ill. App. 3d 858, 863 (1986). The purpose of defendant's civil commitment " 'is to treat the [his] mental illness, and at the same time protect him and society from his potential dangerousness.' " (*People v. Pastewski*, 164 Ill. 2d 189, 197 (1995) (quoting *People v. Williams*, 140 Ill. App. 3d 216, 228 (1986)) and the court does not have to wait until defendant harms himself or someone else before ordering the State to provide the treatment he needs (*In re Lisa G.C.*, 373 Ill. App. 3d at 594).

¶ 30                                    III. CONCLUSION

¶ 31    In sum, we affirm the judgment of the Circuit Court of Kane County. The evidence in this case undeniably showed that defendant was mentally ill, violent, and a serious threat to the public's safety. Additionally, defendant's trouble with understanding consent and respecting social and sexual boundaries makes him even more of a serious threat. As such, the trial court's finding that defendant constituted a serious threat to the public's safety was not against the manifest weight of the evidence.

¶ 32    Affirmed.