SIXTH DIVISION
MARCH 23, 2007

No. 1-06-0139

| | | |
|---|---|---|
| In re HANNAH E., | ) | Appeal from the |
|     Alleged to be a person subject to | ) | Circuit Court of |
|     Involuntary Admission | ) | Cook County. |
| | ) | |
| (The People of the State of Illinois, | ) | No. 05 CoMH 3531 |
| | ) | |
|     Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Hannah E., | ) | Honorable |
| | ) | Robert Bertucci, |
|     Respondent-Appellant). | ) | Judge Presiding. |

PRESIDING JUSTICE FITZGERALD SMITH delivered the opinion of the court:

Respondent, Hannah, E., appeals the circuit court's granting of the State's petition for involuntary admission. Respondent contends that the petition should have been dismissed by the trial court because the certificate supporting the petition was signed by a psychiatrist who examined respondent over the telephone and not in person, and that the certificate was invalid because the person supporting the petition was involved in litigation against respondent. We affirm.

On December 22, 2005, the State filed a petition, supported by Mae Wormely, along with two certificates for respondent's involuntary admission: one from Dr. Kapoor; and one from Mae Wormely. On January 6, 2006, the circuit court held an involuntary commitment hearing. At the hearing the following evidence was presented.

Mae Wormely, an employee with the City of Chicago's department of animal care and control testified, that in response to 911 and 311 calls to the department of animal care and control, she went to respondent's house on Moody Street to assist the Chicago police Department and department on aging to remove animals from respondent's home. When Wormely entered respondent's home, she smelled a strong odor and saw feces completely covering the floor. A squirrel with shaved eyes was inside a cage in the middle of the floor. There were syringes and needles on the floor and a fish tank with a turtle and a dead baby alligator inside. A big turtle and four dead turtles lined the floor near the wall. When Wormely picked up the dead turtles, they disintegrated in her hands. A woodchuck ran past her and two cats were also present. The squirrel ran out of its cage into the kitchen. When Wormely followed the squirrel, a parrot flew by her head, swearing. There were bones sitting near the window, and there was no running water in the home. Wormely stated that she was overwhelmed by the stench inside the home. She removed the animals from the home and placed them with the department of animal care and control. On November 8, 2005, in an emergency order, respondent was ordered to vacate her residence on Moody Street.

Wormely testified that she saw respondent on November 22, 2005, in court at Daley Center. Wormely was not present in the courtroom that day to testify. Respondent yelled to Wormely, "Murderer. You killed my animals. I'm going to kill you like you killed my animals." Wormely was terrified.

On December 20, 2005, Wormely signed a certificate and petition of involuntary admission of respondent at the State's Attorney's Office. On December 22, 2005, Wormely went

to respondent's home again to remove two woodchucks, a turtle, two goldfish and six cats. The floor was cleaner than the first time Wormely went to the home.

Rita Sattler, an aide to respondent's alderman, Thomas Allen, testified that on December 13, 2005, she was in court at Daley Center with respondent for two housing cases. Respondent had known Sattler since 1994. Nevertheless, respondent asked Sattler if she worked for Allen and Sattler replied, "yes." Respondent asked Sattler her name and Sattler told respondent that she would have to tell her later because court was in session. Respondent kept asking her name and then said to Sattler in a threatening and angry manner, "payback is a bitch." Respondent seemed agitated. Sattler told the deputy sheriff that respondent had threatened her and then sat away from respondent. Sattler waited in the courtroom for 20 to 30 minutes after the court session was over to make sure that respondent had gone and then returned to her office to tell the alderman that she had concerns about respondent's threat.

Mark Limanni, an attorney with the Chicago law department testified that he knew respondent from a housing court action that the city brought against her alleging building code violations in relation to her house on Moody Street. On or about December 22, 2005, respondent's psychiatrist and psychologist contacted the law department and indicated concerns about respondent. The certificate of respondent's psychiatrist, Dr. Kapoor was attached to the petition for involuntary admission. Limanni took the documents to the local police commander, and the police and Limanni went to respondent's home and transported respondent to Chicago Read Mental Health Center. Also present at respondent's home were seven or eight police officers, paddy wagons, and Officer Wormely from the department of animal care and control.

To get respondent to come out of her house voluntarily, Limanni had called respondent and told her that he was coming to her house to give her some of her animals back.

Limanni testified that respondent was angry because she felt tricked into coming out of her house. Limanni explained to her that he was sorry but there was no choice because there was concern given the circumstances: that her doctor had provided documentation to take this step; that she owned a weapon; and that she had made frequent remarks about getting and using it against people in housing court. Respondent replied that she did have a gun but that she kept it in the suburbs and not in her home or in the city.

The record indicates that on the same day respondent was admitted to Chicago Read Mental Health Center, Dr. Tiu, a psychiatrist, evaluated respondent and signed another certificate supporting the petition for admission. His evaluation stated:

"[Patient] is very depressed, very tearful and [has] paranoid delusions about neighbors and City of Chicago members killing her pets and severe neglect of self and home. [Patient] made homicidal threat toward CPD officer. [Patient] has handguns and has indicated need for access. [Patient] is refusing meds even for her high blood pressure and impaired judgment and lacks insight."

Dr. Pavlovsky testified that he was board certified in psychiatry and forensic medicine. The court accepted him as an expert witness in the field of psychiatry. Pavlovsky stated that respondent was admitted to Chicago Read Mental Health Center on December 22, 2005, and that he performed his first psychiatric evaluation of respondent the following day. Pavlovsky considered respondent's social history, medical records, and discussions with the hospital staff

regarding respondent's condition. Pavlovsky also considered information from respondent's outpatient psychiatrist, Dr. Kapoor, her outpatient psychologist, Dr. Weisberg, Chicago corporate counsel Limanni and Chicago department of animal control and care employee Wormely. Based upon this information as well as his observation of respondent, Dr. Pavlovsky opined that respondent suffered from a mental illness at the time of admission. Dr. Pavlovsky diagnosed respondent with a delusional disorder plus paranoid personality disorder. Dr. Pavlovsky agreed with Dr. Kapoor's opinion, which gave her the same diagnosis. Dr. Pavlovsky explained that respondent suffered from delusions of persecution and that she believed that people from the city, the department of animal care and control and her neighbors had been plotting against her since she moved into her house and that there was a conspiracy against her. Respondent was also delusional about the condition of her house. Dr. Pavlovsly indicated that respondent was otherwise very polite to the hospital staff. Dr. Pavlovsky concluded that based on his observations and information he believed that respondent may harm herself or others if discharged prematurely particularly because respondent owned weapons. Dr. Pavlovsky based his knowledge regarding respondent's homicidal threats on his conversations with people from the city and Dr. Kapoor. Dr. Pavlovsky testified that when a patient is delusional, paranoid and angry, it is always dangerous. Further, respondent told Dr. Pavlovsky that she owned three guns. Dr. Kapoor told Dr. Pavlovsky that he prescribed antipsychotic medication prior to her admission but that respondent would not take it. Dr. Pavlovsky testified that respondent would not be able to take care of her basic needs because she had poor hygiene and a highly infectious diseased house and would be susceptible to serious medical conditions. Respondent also had high blood

pressure and Grave's disease (a disorder of the thyroid), which were being treated in the hospital and made her more susceptible to health problems living in poor conditions. After considering less restrictive options, Dr. Pavlovsky stated that respondent was not dischargable at that time and would benefit from further locked hospitalization.

Michael Bowlan, a treatment coordinator at Chicago Read Mental Health Center, testified that he was respondent's case manager. On January 5, 2006, respondent told Bowlan that she had three guns but they were in the suburbs, not the city, and that she did not want to harm or kill anyone with a gun. Respondent also told Bowlan that she performed medical procedures on her animals in her home to try to treat their infections.

Respondent's attorney told the court that the certificate signed by Wormely was improper because Wormely failed to indicate that she was involved in litigation with respondent. The court considered this information and found that, based on her testimony, it was not a concern because Wormely was not a party and did not testify in court; Wormely was in court in case she needed to be spoken to regarding the animals. The court concluded that Wormely was not involved in litigation with respondent.

Respondent testified that when she was told to clean her house in housing court on November 8, 2005, she went home and cleaned her house. The only time Wormely spoke in court was to tell the judge that the animals were receiving very good care. Respondent denied threatening Wormely in court. Respondent admitted telling Sattler that "payback is a bitch," but explained that she meant that karma would make sure she was paid back.

Respondent testified that she had seen Dr. Kapoor three times and had been diagnosed

with clinical depression by another psychiatrist. Respondent denied that she made homicidal statements to Dr. Kapoor. She was taking Zoloft and medicine for high blood pressure, high cholesterol and hyperthyroidism. If discharged the day of the hearing, she would either live with friends or in a women's shelter on Wilson and would continue to seek medical treatment and would "probably" seek psychiatric treatment. Respondent testified that she had never hurt anyone and would never hurt anyone. She owned guns because she had once worked in security. Respondent stated that she obtained the guns legally and left them with friends outside the city because it would be illegal to bring them into the city. Respondent never used the guns against anyone and did not know why the city took her animals away from her but admitted that she was "a lousy housekeeper." She took sick animals in and debrided their infected wounds, that is, she cut them open and cleaned the wounds out. Her squirrel's skull was sticking out from a fight with one of her cats and she helped the squirrel's skin grow back by giving it antibiotics. Respondent explained that she had this knowledge because she was once a paramedic and had worked with veterinarians. She was shown pictures of the inside of her house but denied the pictures represented her house. Respondent kept a dead reptile in her house because she was in denial about its death.

The circuit court found the State's witnesses to be credible noting, that respondent collected and operated on animals, including nondomesticated animals, and that her house was a breeding ground for infections and was unhealthy for human or animal habitation. The court found Dr. Pavlovsky's testimony credible regarding respondent's dangerousness and inability to care for her basic needs. The court concluded that the State had proven its case by clear and

convincing evidence and signed an order of involuntary admission.

As a threshold matter, we address petitioner's argument that this appeal is moot because the order involuntarily admitting respondent expired prior to this appeal. "We note that, although the order under review has expired, review of an involuntary admission order is *** appropriate here because 'the collateral consequences related to the stigma of an involuntary admission may confront respondent in the future.'" In re Gail F., 365 Ill. App. 3d 439, 444 (2006), quoting In re Splett, 143 Ill. 2d 225, 228 (1991).

Addressing the merits of the case, respondent argues that Dr. Kapoor's certificate supporting the petition for admission was not valid because he conducted his examination over the telephone and not *personally*, meaning face-to-face, as allegedly required by section 3-602 of the Mental Health and Developmental Disabilities Code (Code). 405 ILCS 5/3-602 (West 2004). Petitioner contends that *personally* can include a telephone interview particularly where, as in this case, the psychiatrist had been treating respondent as an outpatient prior to the telephone examination.

Although respondent did not raise this issue in the circuit court and has waived the issue on review, we elect to address it because respondent argues that she has been the victim of procedural error evident on the face of the record. See In re. N.S., 359 Ill. App. 3d 1125, 1129 (2005).

When a person is alleged to be subject to involuntary admission a petition must be presented to a mental health facility's director. 405 ILCS 5/3-601(a) (West 2004). Further, section 3-602 provides:

"The petition shall be accompanied by a certificate executed by a physician, qualified examiner, or clinical psychologist which states that the respondent is subject to involuntary admission and requires immediate hospitalization. The certificate shall indicate that the physician, qualified examiner, or clinical psychologist *personally* examined the respondent not more than 72 hours prior to admission. It shall also contain the physician's, qualified examiner's, or clinical psychologist's clinical observations, other factual information relied upon in reaching a diagnosis, and a statement as to whether the respondent was advised of his rights under Section 3-208." (Emphasis added.) 405 ILCS 5/3-602 (West 2004).

In interpreting statutes, we must give effect to the intention of the legislature. United Airlines, Inc., v. Department of Revenue, 367 Ill. App. 3d 42, 46 (2006). The language of the statute is the best indication of legislative intent. In re Application of County Collector, 356 Ill. App. 3d 668, 670 (2005). Words in the statute should be construed in context and given their plain and ordinary meaning. County Collector, 356 Ill. App. 3d at 670. We review the interpretation of a statute *de novo*. County Collector, 356 Ill. App. 3d at 670.

The Code does not define "personally," but Webster's defines it as: "so as to be personal: in a personal manner; *often*: as oneself: on or for one's own part." Webster's Third New International Dictionary 1687 (1981).

In this case, Dr. Kapoor was respondent's treating physician when he examined her over the telephone and determined that she was subject to involuntary admission. He performed the interview personally, that is, he performed the interview *himself*. We find that in light of the fact

9

that Dr. Kapoor was respondent's treating physician, his telephone interview meets the requirement that he *personally* examined respondent for purposes of section 3-602 of the Code.

Respondent cites In re Michelle J., 209 Ill. 2d 428 (2004), to support her argument. However, this case does not support respondent's position. In Michelle J., a consolidated case of Michelle J. and Sam S., the supreme court held that the testimony of a psychologist who did not examine the respondent Sam S. could not support a petition to continue the involuntary admission of Sam S. Michelle J., 209 Ill. 2d at 436-37. The psychologist had never examined or seen Sam S. and had merely reviewed his medical records. Michelle J., 209 Ill. 2d at 436-37. Contrary to that testimony, in this case, Dr. Kapoor interviewed respondent and was respondent's treating psychiatrist. In fact, this case is more like the case consolidated with Michelle J., where the testimony of the psychologist was sufficient to support the petition of the respondent Michelle J. even though the psychologist did not interview Michelle J. the day before the hearing but had seen Michelle J. in a group session three days prior and had been part of Michelle J.'s treatment team. Michelle J., 209 Ill. 2d at 439. Thus, Michelle J. supports petitioner's rather than respondent's position in this case.

Respondent also cites Newman v. Reilly, 314 Md. 364, 550 A. 2d 929 (1988). However, cases from foreign jurisdictions are not binding on this court. Mikrut v. First Bank of Oak Park, 359 Ill. App. 3d 37, 58 (2005). Further, we do not find Newman persuasive because the case merely holds that it is not bad faith to argue that personal examination means face-to-face contact. Newman, 314 Md. at 381-82, 550 A. 2d at 967-68.

Next, respondent contends that Dr. Kapoor's certificate contains two mistakes: that

respondent was mentally retarded; and that respondent was admonished as to her rights to speak with a friend, relative or attorney before the exam.  However, respondent fails to point to any testimony directly contradicting these alleged mistakes.  Therefore, these alleged mistakes are of no consequence here.

In addition, respondent contends that the petition should have been dismissed because Mae Wormely failed to disclose on the petition that she was involved in litigation with respondent as required by section 3-601(b)(3) of the Code.  405 ILCS 5/3-601(b) (West 2004).  Petitioner argues that Wormely was not sufficiently involved in litigation to warrant dismissal of the petition.    Section 3-601(b)(3) provides:

> "The petition shall include all of the following:
>
> * * *
>
> 3. The petitioner's relationship to the respondent and a statement as to whether the petitioner has a legal or financial interest in the matter or is involved in litigation with the respondent.  If the petitioner has a legal or financial interest in the matter or is involved in litigation with the respondent, a statement of why the petitioner believes it would not be practicable or possible for someone else to be the petitioner"  405 ILCS 5/3-601(b) (West 2004).

For purposes of statutory interpretation, we evaluate the provision as a whole, rather than reading phrases in isolation.  United Airlines, Inc., 367 Ill. App. 3d at 47.  We review the interpretation of a statute *de novo*.  County Collector, 356 Ill. App. 3d at 670.

Reading the provision as a whole, we do not believe Wormely was involved in litigation

11

with respondent in this case. The only testimony regarding Wormely's involvement in respondent's litigation was that she worked for the Chicago department of animal care and control and was present in housing court to provide information regarding the condition of the animals and answer questions if needed. Wormely testified that she had never testified in housing court against respondent, while respondent testified that she had. However, the circuit court found the State's witnesses to be more credible than respondent's testimony. There was no testimony that Wormely had any personal stake or any financial interest in the outcome of the case. There was no testimony establishing any basis for bias against respondent. Accordingly, we find that Wormely was not involved in litigation for purposes of section 3-601(b)(3) and that the circuit court properly decided not to dismiss the petition based on this argument.

Respondent argues that had she known of Wormely's alleged involvement in litigation before the trial, she could have ordered transcripts to impeach Wormely. However, respondent offers no explanation as to why she did not order transcripts on appeal to establish prejudice.

Affirmed.

JOSPEPH GORDON and O'MALLEY, JJ., concur.