FIFTH DIVISION
September 28, 2007

No. 1-06-1956

| | | |
|---|---|---|
| In re HANNAH E., | ) | Appeal from the |
| | ) | Circuit Court of |
| Alleged to be a Person Subject to | ) | Cook County. |
| Involuntary Admission | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 06 CoMH 1424 |
| | ) | |
| Hannah E., | ) | The Honorable |
| | ) | Marcia Maras, |
| Respondent-Appellant). | ) | Judge Presiding. |

PRESIDING JUSTICE FITZGERALD SMITH delivered the opinion of the court:

Respondent-appellant Hannah E. (respondent) appeals the trial court's grant of petitioner-appellee People of the State of Illinois' (State) petition for involuntary admission. Respondent contends that her hearing was not conducted in a timely manner, the certificate supporting the petition was invalid, the State did not prove harm by clear and convincing evidence, and the trial court erroneously failed to consider and use a least restrictive alternative disposition to commitment. Respondent asks that we reverse the trial court's order. For the following reasons, we affirm.

BACKGROUND

The underlying facts regarding this cause have been set forth adequately in the related case of In re Hannah E., 372 Ill. App. 3d 251 (2007), dealing with the first of three commitment orders involving respondent. We restate herein only what is necessary for the disposition of the instant cause.

No. 1-06-1956

An involuntary commitment order for respondent was issued on January 6, 2006, based upon a petition filed by the State and supported by a certificate from Mae Wormely, an employee of the City of Chicago's department of animal care and control, and a certificate from respondent's psychiatrist. Testimony at the ensuing hearing indicated that respondent, who had been keeping a multitude of living and deceased domesticated and nondomesticated animals in her Chicago home, had threatened Wormely after Wormely had entered her home to remove the animals; that she had threatened Rita Sattler, an aide to respondent's alderman, following court cases resulting in the removal of respondent from her home due to building code violations and its deplorable condition; and that she, upon her arrival at Chicago Read Mental Health Center (Chicago Read), suffered from mental illness. See Hannah E., 372 Ill. App. 3d 253-55. While in the care of doctors, respondent told them she owned three guns which she insisted she kept in the suburbs and not within city limits; however, upon investigation, two guns were found in respondent's Chicago home and the third was never recovered. See Hannah E., 372 Ill. App. 3d at 253-56. Further investigation revealed ammunition, holsters, handcuffs and mace in respondent's home as well. Respondent appealed her involuntary commitment, but we affirmed. See Hannah E., 372 Ill. App. 3d at 259-60.

When respondent's involuntary commitment expired on April 6, 2006, a second involuntary commitment petition was filed. This was later dismissed because respondent signed an application for voluntary admission, and she remained at Chicago Read. Following the expiration of this second order, respondent did not renew her voluntary admission and instead wanted to be released from Chicago Read. Adrienne Mazique, respondent's social worker, filed a

2

third petition for involuntary commitment on behalf of the State, which is the basis of the current appeal. In the petition, Mazique stated that respondent was mentally ill and expected to inflict harm to herself or others. A hearing was held on this petition in June and July 2006.

In addition to Wormely and Mazique, David Zempich, a technician at Chicago Read, testified that on April 11, 2006, he saw respondent leave her room and approach the nurses' desk yelling that she had not received her medication. After the charge nurse explained to respondent that all medications had been dispensed, security was called to perform a room check. Zempich testified that he, the nurse and a security guard entered respondent's room and he asked respondent if she would cooperate with the room search; respondent ignored Zempich, and the nurse then ordered Zempich to search respondent. When Zempich attempted to remove a pen from respondent's hand so he could search her, she tried to bite his wrist. Zempich pulled away, but respondent grabbed Zempich's hand and scratched him three or four times, leaving scars.

Several doctors also testified at the hearing. Dr. Charles Stiava, respondent's treating psychologist at Chicago Read from January to May 2006, conducted several psychological tests and, in a report dated February 9, 2006, found that respondent suffered from major depression and had pronounced rebelliousness and belligerence consistent with a diagnosis of paranoid personality disorder. Though he did not indicate in the report that respondent had a desire to hurt herself or others, Dr. Stiava noted that her paranoid personality disorder could possibly lead to violence, particularly because respondent's third gun was still missing and because she had lied about the location of the guns that already had been found. Dr. Stiava also concluded that if respondent left Chicago Read and returned home, to where she was not allowed to go pursuant to

court order, and if she were confronted there or told to leave, she could be a danger.

Dr. Evelyn Morales, respondent's psychiatrist from February to May 2006, was one of two doctors who filed a supporting certificate to Mazique's petition for respondent's involuntary commitment. Dr. Morales based her certificate on her observations of respondent, her examination of respondent's medical charts, and conversations she had with respondent's other physicians. Dr. Morales testified that she examined respondent and found her to be mentally ill and reasonably expected to inflict serious physical harm to herself or others in the near future. She based this on respondent's threat to Wormely and on respondent's behavior during the period in which Dr. Morales treated her.

Dr. Flora Baetiong, respondent's current attending psychiatrist as of May 2006 and the second doctor who filed a supporting certificate to Mazique's petition for involuntary commitment, testified that she first diagnosed respondent with major depression and paranoid personality disorder and it was her opinion that respondent still suffered from these. She based this on respondent's previous medical records, her medical history, and Dr. Baetiong's direct observations and conversations with respondent. Dr. Baetiong testified that respondent was currently refusing medication, was very upset and depressed that she had been ordered to vacate her home, and believed that the City of Chicago was out to ruin her life. Considering respondent's previous threat to Wormely and the fact that the third gun was still missing, Dr. Baetiong stated that she was concerned about discharging respondent from Chicago Read because there was a reasonable probability that respondent would harm others. Dr. Baetiong further testified that it was her recommendation that respondent remain hospitalized, as less restrictive alternatives were

4

considered and presented to respondent (including going to live with a friend in the suburbs) but respondent refused them and wanted only a complete discharge so she could return to her own home.

On respondent's behalf, Dr. Robert Sharpe testified that he conducted an independent examination of her in February 2006 and again in June 2006. In his initial exam, he concluded that respondent did not have a personality disorder but, rather, was bipolar. His later exam noted that respondent did not have a propensity to violence, was not experiencing hallucinations or delusions, and there was no indication of risk of harm to herself or others. It was Dr. Sharpe's opinion that respondent should not be subject to involuntary hospitalization at this time. However, Dr. Sharpe admitted that he never spoke to or consulted with any of respondent's former or current treating psychiatrists and that his evaluations of her resulted from only "nominally" observing her for 45 minutes. Dr. Sharpe also noted that respondent had made only limited progress in terms of her hospitalization and that she was continuing to refuse any medications.

On July 17, 2006, at the close of the hearing, the trial court ordered respondent subject to involuntary commitment. In its lengthy colloquy, the court explained that from all the evidence, it was clear that respondent suffers from a mental illness. It commented that while the doctors could not all agree on one exact diagnosis, Drs. Baetiong, Stiava and even Sharpe agreed in one way or another that respondent had a character trait of paranoid personality disorder. Regarding the existence of a risk of harm to herself or others, the court noted that Dr. Baetiong had testified that the object of respondent's paranoia was the City of Chicago and any of its employees who

No. 1-06-1956

would attempt to enforce the current court orders removing her from her home; the court remarked that several witness had testified to respondent's insistence that upon her discharge, she would undoubtedly return to live there even though this was prohibited. The court further discussed the fact that respondent had lied about the location of her guns and that only two had been found, as well as the fact that she had threatened Wormely and Sattler, had hurt Zempich, and was diagnosed by Dr. Stiava as having a pronounced rebelliousness to authority. In reviewing Dr. Sharpe's opinion, the court stated that he spent only 45 minutes with her during 2 examinations and had admitted on cross-examination that he had not spoken to any of respondent's psychiatrists and did not know anything about the incidents in which she was involved. Accordingly, the court held that the State had "met its burden and shown by clear and convincing evidence that Respondent suffers from a mental illness *** [and] is reasonably expected to cause harm to others."

The court then examined whether a "least restrictive alternative" to continued hospitalization was viable in this case. The court recalled the testimony of several witnesses discussing Dr. Baetiong's offer of a care and custody order which would have allowed respondent to live with a friend in the suburbs and complete aftercare there, and respondent's rejection of it in favor of returning to her home in Chicago. This, along with the opinions of Dr. Baetiong, Dr. Stiava and social worker Mazique that respondent should not return home, and the court orders prohibiting such a return, comprised the basis of the court's holding that, "at this time a locked facility is the most appropriate place for Respondent and [the] least restrictive alterative."

ANALYSIS

6

No. 1-06-1956

As a threshold matter, just as it did in the related appeal involving respondent's first involuntary commitment order, the State argues here that this appeal is moot because the July 17, 2006, order involuntarily committing respondent has expired. See Hannah E., 372 Ill. App. 3d at 257. However, we recall the proposition we cited in our prior decision in response to this: " 'although the order under review is expired, review of an involuntary admission order is nevertheless appropriate because "the collateral consequences related to the stigma of an involuntary admission may confront respondent in the future." ' " Hannah E., 372 Ill. App. 3d at 257, quoting In re Gail F., 365 Ill. App. 3d 439, 444 (2006), quoting In re Splett, 143 Ill. 2d 225, 228 (1991). Accordingly, having taken into consideration the arguments presented by both parties regarding mootness, we choose to exercise our review over the instant cause. See, *e.g.*, In re Louis S., 361 Ill. App. 3d 763, 767-68 (2005) (even though involuntary commitment order expired, case would be reviewed on appeal as the respondent had history of mental illness and history of prior involuntary hospitalizations).

I. Timeliness

Addressing the merits of the case, respondent first contends that the commitment order must be reversed since her hearing was not completed in a timely manner pursuant to section 3-800(b) of the Mental Health and Developmental Disabilities Code (Code) (405 ILCS 5/3-800(b) (West 2004)), as there were continuances granted beyond the mandated 15 days that she had not requested. According to respondent, apart from two continuances that were attributable to her, her cause should have been resolved no later than June 30, 2006, and the trial court violated her strict procedural protections by extending this to July 17, 2006. For its part, the State maintains

7

that respondent has waived this issue for review since she failed to raise it in the trial court; the

State further argues that, based on the facts and circumstances of this case, the continuances were

necessary and attributable to respondent.

We note that the State is correct that respondent has waived this issue for review. See In

re Nau, 153 Ill. 2d 406, 417 (1992) (involuntary admittee waived untimeliness of petition when

failed to raise timeliness objection at trial). However, even if not waived, we agree with the State.

Respondent points out that, in involuntary commitment proceedings, strict compliance

with statutory procedures is required because these proceedings affect important liberty interests.

See In re Lisa G.C., 373 Ill. App. 586, 590 (2007); accord In re Tommy B., 372 Ill. App. 3d 677,

683 (2007); see also In re Nancy A., 344 Ill. App. 3d 540, 549 (2003) (Code's procedures are not

mere technicalities but, rather, essential tools to safeguard liberty interests and must be strictly

construed and followed). Respondent is also correct that whether the State strictly complied with

these procedures is reviewed *de novo*. See Lisa G.C., 373 Ill. App. 3d at 590. However, the

State's failure to strictly comply with statutory procedures does not require reversal unless a

respondent suffered prejudice therefrom. See Tommy B., 372 Ill. App. 3d at 683; accord Lisa

G.C., 373 Ill. App. 3d at 590. In other words, when the respondent "is unable to demonstrate

how she was prejudiced by any alleged failure to comply with procedural requirements," her claim

in this regard cannot stand. Lisa G.C., 373 Ill. App. 3d at 590.

Turning to the specifics of respondent's contention here, we note that section 3-800(b) of

the Code states:

"If the court grants a continuance on its own motion or upon the motion of

one of the parties, the respondent may continue to be detained pending further order of the court. Such continuance shall not extend beyond 15 days except to the extent that continuances are requested by the respondent." 405 ILCS 5/3-800(b) (West 2004).

The decision whether to grant a continuance depends on "the particular facts and circumstances surrounding the request." In re Bert W., 313 Ill. App. 3d 788, 793 (2000). A key factor when examining the propriety of this decision is whether the party requesting the continuance has shown a lack of due diligence in proceeding with the cause. See Nancy A., 344 Ill. App. 3d at 550; accord Bert W., 313 Ill. App. 3d at 793. Ultimately, the grant of a continuance is within the sound discretion of the trial court and will not be set aside unless it amounts to an abuse of this discretion. See Nancy A., 344 Ill. App. 3d at 550; Bert W., 313 Ill. App. 3d at 793.

Essentially, respondent is challenging two "continuances" that she asserts improperly prolonged her cause to July 17, 2006, or 42 days after the involuntary commitment petition was filed, rather than June 30, 2006, which she claims would have been "the last possible day for hearing."

What occurred during the first cited "continuance," *i.e.*, from June 22 to June 29, 2006, presented a unique situation. The involuntary commitment petition was filed on May 30, 2006. Pursuant to the Code, respondent's hearing should have begun June 5, 2006. See 405 ILCS 5/3-611 (West 2004) ("[u]pon the filing of the petition and first certificate, the court shall set a hearing to be held within 5 days"). On that date, respondent asked the court for a continuance until June 8, 2006, because her attorney was not available. When the hearing resumed on June 8,

9

2006, the State asked the court for a seven-day continuance until June 15, 2007, which was granted. On June 15, 2006, the parties, via an agreed order, caused the hearing to be postponed until June 22, 2006.[1] According to respondent's argument, this left the State with eight days of continuances under section 3-800(b) of the Code, or to June 30, 2006.

However, on June 22, 2006, Dr. Baetiong was testifying as to her opinion regarding the potential harm respondent may inflict, her recommendation as to her release, and less restrictive alternatives to hospitalization. During cross-examination, respondent sought to question Dr. Baetiong as to certain settlement negotiations that had occurred between respondent and the State before trial.[2] Upon objection, respondent argued that this information was admissible since it was contained in Dr. Baetiong's progress notes, while the State argued that this was rejected settlement negotiation material, which was not admissible. The court conducted a lengthy discussion with the parties in chambers and concluded that this information went to Dr. Baetiong's opinion regarding harm as well as the least restrictive alternative, both of which were prime issues in the current proceeding. In fact, the court repeatedly noted that respondent had obviously anticipated this argument, had researched it and had prepared for it, to the "disadvantage" of the

---

[1]We note for the record that respondent insists in her brief on appeal she did not ask for either the June 5 or June 15, 2006, continuance. She does admit, however, that both were granted upon her counsel's request and, thus, ultimately concedes that they are attributable to her.

[2]These negotiations entailed respondent promising to leave Chicago, go live with a friend in the far suburbs, and continue her aftercare there. Respondent rejected this offer and chose to proceed to trial, as she insisted on a full discharge so she could return to her home in Chicago.

State and the court, both of whom would need time to do the same. The court acknowledged respondent's liberty interest and that the situation was "stretching that, but because of the type of information it is, because of the allegations that are out there," it was willing to stretch it "but not to any extreme time frame." Finding this to be "highly volatile" and "serious," the court stated it was using its discretion to set a formal briefing schedule on the issue and would reach a ruling on June 29, 2006. The court also postponed any further testimony from the State's witnesses until that time because only when the issue of settlement negotiations was resolved would the State "be in a *** position to even figure out what [respondent's] case was about and who she would be calling," and thus ordered the State's testimony to resume on July 12, 2006.

Respondent's second cited "continuance" occurred on July 13, 2007. Following the close of testimony, which comprised some 15 witnesses during the hearing, it was already 4 p.m. Noting the time, that closing arguments still had to be conducted and that respondent's counsel worked only part-time, the court suggested that everyone return Monday morning, July 17, 2006, for its decision. The court explained that it did not want to "rush[]" the attorneys during their closing arguments and that it "would need at least and hour, an hour and a half to make a cohesive ruling" on the case. Again, the court acknowledged that it was not taking respondent's liberty interest "lightly," but that it believed that its "rushing to a decision in this matter would not be of any benefit to" her.

Based upon this, we do not feel that the trial court abused its discretion by continuing the case as it did or that respondent was in any way prejudiced. Regarding the first "continuance," we fail to see how what occurred can be labeled a continuance attributable to the State, as respondent

11

No. 1-06-1956

insists. Upon our review of the record, it is clear that the State never asked the trial court for a "continuance." Rather, the court quickly observed that respondent had anticipated the issue of the admissibility of a doctor's progress notes containing information regarding a settlement. In fact, the court noted that respondent had come prepared with citations to legal precedent. In light of this, the court found it only "fair" that the State, and the court itself, be allowed to conduct their own research and respond. After all, as the court found and as we wholeheartedly agree, this issue was of vital importance to the cause because the evidence went to respondent's threat of harm and the least restrictive alternative; a briefing schedule was undeniably necessary, and the court spent quite a bit of time hammering out the time frame of this with both parties. Moreover, during the discussion in chambers, the court acknowledged respondent's concern with her liberty interest under the Code and presented her with the option of continuing the hearing immediately and without interruption if she withdrew this issue. Respondent chose, however, not to do so. Therefore, were we to consider this a continuance of any kind, we would find it to be one attributable to respondent under section 3-800(b) of the Code.

Furthermore, regarding the second "continuance," we find that the trial court properly used its discretion to postpone its final decision to July 17, 2006. Following its June 29, 2006, decision regarding the settlement issue, there were several remaining witnesses that needed to testify, taking the trial to late in the afternoon of Thursday, July 13, 2006. With closing arguments yet to be given, the court noted that it would need at least an hour to review the evidence and reach a decision. The parties and the court together discussed that, based on everyone's schedule, including that respondent's counsel worked only part-time, it was best to

12

postpone the final decision until Monday, July 17, 2006. Again, the court acknowledged respondent's liberty interest, but noted that rushing its judgment would not benefit her or anyone else.

Ultimately, we fail to see how respondent was prejudiced here. In the first instance, she raised the issue that resulted in the formation of the briefing schedule and the postponement of testimony, and she refused to withdraw it in favor of an uninterrupted return to her hearing; in the second instance, the trial court aptly used its discretion in light of the time of day. In both situations, there is nothing to suggest that the State was being dilatory or attempting to circumvent the statutory requirements of section 3-800(b) of the Code. See Nancy A., 344 Ill. App. 3d at 550-51. Nor do we find, in light of the particular circumstances presented here, that the trial court's decisions regarding the "continuances" was an abuse of discretion or that they made a bit of difference here. See Nau, 153 Ill. 2d at 419 (procedural deviations from Code do not require reversal if made no difference). Without more, we will not reverse the trial court in this regard. See, *e.g.*, Lisa G.C., 373 Ill. App. 3d at 593 (holding that delay of 22 days when the respondent agreed to prior continuance did not prejudice her, as compared to In re Williams, 140 Ill. App. 3d 708 (1986), where delay of 5 ½ months was found to be serious abuse of that respondent's rights).

## II. Dr. Morales' Certificate

Respondent's next contention is that the involuntary commitment petition filed against her on May 30, 2006, which initiated this cause, was invalid because one of the certificates was not properly executed. Specifically, respondent argues that Dr. Morales' certificate supporting the

13

petition did not meet the Code's requirements because Dr. Morales was no longer respondent's treating physician, did not speak to her, did not review her medical records, and based her certificate on respondent's past actions. As a threshold matter, we note, as the State does, that respondent has waived this issue for review. As evidenced by the record, respondent failed to object at the beginning of the involuntary commitment hearing to the validity of Dr. Morales' certificate; moreover, respondent never raised an objection in this regard at any point during Dr. Morales' testimony. See Nau, 153 Ill. 2d at 417 (failure to object to issue at hearing on involuntary commitment results in issue's forfeiture).

Waiver aside, we disagree with respondent's contention here. Section 3-602 of the Code, governing the contents of a certificate accompanying an involuntary commitment petition, states:

"The petition shall be accompanied by a certificate executed by a physician, qualified examiner, or clinical psychologist which states that the respondent is subject to involuntary admission and requires immediate hospitalization. The certificate shall indicate that the physician, qualified examiner, or clinical psychologist personally examined the respondent not more than 72 hours prior to admission. It shall also contain the physician's, qualified examiner's, or clinical psychologist's clinical observations, other factual information relied upon in reaching a diagnosis, and a statement as to whether the respondent was advised of his rights under Section 3-208." 405 ILCS 5/3-602 (West 2004).

See also 405 ILCS 5/3-208 (West 2004) (the respondent has the right not to speak to her examiner).

14

No. 1-06-1956

From our review of the record, it is clear that Dr. Morales' certificate followed the statutory requirements of the Code. Dr. Morales had been respondent's treating psychiatrist from February to May 1, 2006. She testified, and her certificate shows, that she examined respondent on May 30, 2006, at 3:30 p.m., the day respondent was involuntarily committed. During that examination, respondent, as was her right pursuant to section 3-208, chose not to speak with Dr. Morales. Dr. Morales testified, in direct contradiction to respondent's assertion on appeal, that, accordingly, she instead reviewed respondent's current medical chart, read respondent's progress notes from May 1 to May 30, 2006, and talked to Dr. Baetiong, respondent's current treating psychiatrist. Dr. Morales testified that she further based her opinion and certificate ordering respondent's involuntary commitment on her threat to Wormely and her behavior when Dr. Morales was her psychiatrist.

Respondent argues that Dr. Morales' certificate was invalid because it was based on "stale information," particularly, on respondent's initial threat to Wormely and respondent's behavior when Dr. Morales was her psychiatrist, some 30 days before the certificate was made. Respondent is correct when she states that the Code anticipates that "fresh information" will be used as the basis for involuntary commitment and that examiners executing certificates must based them on the respondent's current condition. See In re Tiffin, 269 Ill. App. 3d 581, 584 (1995); In re Barbara H., 183 Ill. 2d 482, 497 (1998). However, just as respondent further states, to satisfy the principle that the certificate is indeed based on a respondent's current condition, the examiner must either talk to the respondent or, if the respondent chooses not to so talk, the examiner must observe the respondent and review her current medical records. See In re Shirley M., 368 Ill.

15

No. 1-06-1956

App. 3d 1187, 1192-93 (2006) (examiner who does not talk with the respondent is still qualified to render opinion if he has personally observed the respondent and has reviewed her medical records).

In the instant case, Dr. Morales' certificate was not wholly based on "stale information." To the contrary, she testified that she attempted to examine and speak to respondent on May 30, 2006, the very day the petition was filed against her and, thus, well within the 72 hours prior to admission prescribed by section 3-602. When respondent refused to speak to her, Dr. Morales, in an effort to ensure an opinion based on respondent's current condition, reviewed respondent's current medical chart, consulted with her current psychiatrist and read respondent's progress notes made after the day Dr. Morales ceased being her physician (May 1, 2006) to the day she prepared the certificate (May 30, 2006). That Dr. Morales took into consideration respondent's past threat to Wormely and her behavior during the time Dr. Morales treated her, in addition to these actions of reviewing respondent's current condition, is of no consequence, particularly since section 3-602 states that "other factual information relied upon" by the examiner may be included in the certificate. 405 ILCS 5/3-602 (West 2004). Additionally, a respondent's "psychiatric history is one of the most important criteria in making a diagnosis." In re Houlihan, 231 Ill. App. 3d 677, 683 (1992) (commitment order upheld where psychiatrist's opinion was based on knowledge of incidents derived from medical history records). "An examining physician may properly consider [the] respondent's complete medical history in forming her opinion concerning" her mental condition (Lisa G.C., 373 Ill. App. 3d at 594; accord In re Todd K., 371 Ill. App. 3d 539, 543 (2007) (opinion can be derived from medical history records)), and, where there is evidence of

16

" 'prior conduct along with evidence that the respondent remains in need of mental treatment,' " a commitment order should be affirmed (Todd K., 371 Ill App. 3d at 543, quoting In re Robert H., 302 Ill. App. 3d 980, 987 (1999)).

Accordingly, we find that Dr. Morales' certificate was in compliance with statutory requirements and we will not reverse respondent's commitment order on this ground.

### III. Finding of Harm

Respondent's next contention on appeal is that the State failed to prove by clear and convincing evidence that she was a harm to others and, therefore, she should not have been subject to involuntary commitment. She asserts that, based on Dr. Baetiong's testimony and the fact that respondent was presented with an offer of "freedom," this standard was not met in her cause. We disagree.

A person is subject to involuntarily commitment if it is established by clear and convincing evidence that the person has a mental illness and, because of her illness, she is " 'reasonably expected to inflict serious physical harm upon *** herself or another in the near future.' " Lisa G.C., 373 Ill. App. 3d at 594, quoting 405 ILCS 5/1-119(1) (West 2004); accord Bert W., 313 Ill. App. 3d at 794 (State must submit "explicit medical testimony" that the respondent is reasonably expected to be serious danger to self or others as result of her mental illness); Todd K., 371 Ill. App. 3d at 542. The standard of review for an involuntary commitment proceeding is whether the judgement is against the manifest weight of the evidence. See Lisa G.C., 373 Ill. App. 3d at 594; accord Tommy B., 372 Ill. App. 3d at 686; Todd K., 371 Ill. App. 3d at 542. The trial court's decision is afforded great deference, particularly because it is in a superior

position to see the witnesses, hear their testimony, determine their credibility and weigh the evidence. See Lisa G.C., 373 Ill. App. 3d at 594; Tommy B., 372 Ill. App. 3d at 686; Todd K., 371 Ill. App. 3d at 542. Absent a showing that it is against the manifest weight of the evidence, the trial court's decision will not be set aside, even if the reviewing court would have ruled differently. See Lisa G.C., 373 Ill. App. 3d at 594; accord Todd K., 371 Ill. App. 3d at 542.

While proof of mental illness, by itself, is not sufficient to warrant involuntary admission, the State need not prove that the respondent is a " 'definite danger to [her]self or society.' " Tommy B., 372 Ill. App. 3d at 686, quoting In re Grimes, 193 Ill. App. 3d 119, 124 (1990). Moreover, a trial court does not have to wait to involuntarily commit a respondent until she hurts herself or someone else. See Lisa G.C., 373 Ill. App. 3d at 594; Bert W., 313 Ill. App. 3d at 794; Todd K., 371 Ill. App. 3d at 543. As we discussed earlier, "[a] treating psychiatrist's opinion of potential dangerousness need not be derived from firsthand observations of violence and may be based on knowledge of incidents derived from medical history records." Todd K., 371 Ill. App. 3d at 543. In fact, "[a]n examining physician may properly consider a respondent's complete medical history in forming her opinion concerning [the] respondent's current and future dangerousness." Lisa G.C., 373 Ill. App. 3d at 594; Todd K., 371 Ill. App. 3d at 543. And, ultimately, " '[a] commitment order should be affirmed where there is evidence of prior conduct along with evidence that the respondent remains in need of mental treatment.' [Citation.]" Tommy B., 372 Ill. App. 3d at 687; Todd K., 371 Ill. App. 3d at 543.

In the instant case, the State proved through the testimony of Dr. Baetiong, respondent's treating psychiatrist, that respondent suffers from chronic major depression with paranoid

18

personality disorder and is, thus, mentally ill. The State also proved through Dr. Baetiong's testimony that, because of respondent's mental disease, it is reasonably possible that she will inflict serious physical harm upon another. Specifically, Dr. Baetiong testified that she had evaluated respondent, observed her behavior, spoke to her former physicians, reviewed her medical records and examined photographs taken of respondent's home. Dr. Baetiong stated that it was clearly her opinion that respondent believed that others were out to harm her and "ruin" her life, particularly the City of Chicago and its employees who took her animals and forced her from her home. Dr. Baetiong further testified that this, combined with her previous threats, her possession of and lies about guns, and her current refusal of all medications, gave her great concern for discharging her, particularly because respondent was so adamant about returning to her home in Chicago where she was prohibited by court order from going. And, as Dr. Baetiong pointed out, while respondent had been doing well, this was so because she was in a structured hospital setting where none of the objects of her paranoia (*i.e.*, City of Chicago employees) were present.

In its determination that respondent was a harm to others due to her mental illness, the trial court noted that the State provided further evidence in addition to Dr. Baetiong's medical opinion. The court recalled Dr. Stiava's testimony concurring with Dr. Baetiong that respondent had depression and paranoid personality disorder, as well as Dr. Stiava's observations that respondent exhibited a pronounced rebelliousness and belligerence toward those in authority. The court also discussed respondent's threats to Wormely and Sattler and her physical altercation with Zempich, in which she harmed him. The court commented that all this, combined with the testimony of several witnesses that respondent was determined to return to live in her Chicago

19

home regardless of any court order and in the same city whose employees were "out to ruin her life," provided clear and convincing proof that respondent had a mental illness and that, because of this, she is reasonably expected to inflict serious physical harm upon another in the near future.

Briefly, respondent cites Foucha v. Louisiana, 504 U.S. 71, 118 L. Ed. 2d 437, 112 S. Ct. 1780 (1992), and People v. Czyz, 92 Ill. App. 3d 21 (1980), for the proposition that a person cannot be involuntarily committed simply because of an antisocial personality. However, her reliance on these cases is misplaced, as they are distinguishable from the instant cause. Unlike this situation, which involved proceedings under the Code, the defendants in Foucha and Czyz were criminal defendants found not guilty by reason of insanity. In addition, the defendant in Foucha was later released because, after not exhibiting any signs of mental illness for four years, it was determined via medical testimony that he had recovered (see Foucha, 504 U.S. at 75-77, 118 L. Ed. 2d at 444-46, 112 S. Ct. At 1782-84), and in Czyz, it was obvious that the State had not proved that the defendant was mentally ill at the time and a danger to himself or others in light of the testimony of three doctors who specifically testified to the contrary (see Czyz, 92 Ill. App. 3d at 25-27). Here, there was no testimony that respondent was mentally ill and then stopped exhibiting such signs or "recovered" from her chronic depression and paranoid personality disorder as in Foucha. And, as we have already discussed, the State presented ample clear and convincing evidence, particularly through the explicit medical testimony of Dr. Baetiong, that respondent is mentally ill and reasonably expected to inflict serious physical harm upon another in the near future due to her illness, unlike in Czyz. See, *e.g.*, Lisa G.C., 373 Ill. App. 3d 586; Tommy B., 372 Ill. App. 3d 677; Todd K., 371 Ill. App. 3d 539; Bert W., 313 Ill. App. 3d 788.

20

Therefore, we do not find that the trial court's conclusion that the State met its burden regarding harm was against the manifest weight of the evidence.

## IV. Least Restrictive Alternative

Respondent's final contention on appeal is that, if we were to hold that she was properly committed for harm (as we just have), then the trial court should have employed the care and custody offer proposed earlier to respondent as the least restrictive alternative to hospitalization. Respondent asserts that the trial court here committed manifest error when it did not order this option, which had otherwise been available to respondent up to the night before her hearing.

In mental health cases, "[t]here is a statutory preference for treatment other than hospitalization." Bert W., 313 Ill. App. 3d at 798. Therefore, a trial court is to order placement of a respondent subject to involuntary admission in the least restrictive placement alternative. See Lisa G.C., 373 Ill. App. 3d at 596 (court is required to do so pursuant to section 3-811 of the Code); Bert W., 313 Ill. App. 3d at 798. The burden remains with the State to demonstrate that hospitalization is the least restrictive alternative, and this may be proved via an expert who opines, and whose opinion is supported by the evidence, that commitment is the least restrictive means. See Tommy B., 372 Ill. App. 3d at 688-89. Great deference is given to the trial court's factual findings on this issue because, again, it is in the best position to weigh the credibility of the witnesses. See Bert W., 313 Ill. App. 3d 798. Accordingly, we will reverse the trial court's determination only if we find it to be manifestly erroneous. See Bert W., 313 Ill. App. 3d 798.

In the instant case, it is true that the State proposed a "care and custody" plan to respondent, which consisted of her leaving Chicago Read and going to live with a friend in the

21

suburbs (outside the City of Chicago), where she would continue with outpatient treatment. Dr. Baetiong testified that she was in favor of this plan until she spoke directly with respondent about it on June 20 and 21, 2006, the days immediately before respondent's cause reconvened for hearing following her and the State's continuances. Dr. Baetiong testified that, at this point, respondent rejected the plan and insisted that she was going back to her home in Chicago upon release. According to Dr. Baetiong, this concerned her, considering that she was prohibited by court order to return there and, with the third gun still missing, that she posed a threat to an official from the City of Chicago, or anyone whom respondent may mistake as this object of her paranoia, who would attempt to enforce the court order. Dr. Baetiong further testified that she attempted to discuss other alternatives to hospitalization with respondent, such as nursing homes, but respondent refused and demanded a full discharge so she could return home.

In its colloquy, the trial court directly addressed the question of the least restrictive alternative in respondent's case. Specifically finding that the State had met its burden regarding this issue, the court noted that alternatives had been offered to respondent but that she rejected them. In determining whether these were still viable options, the court discussed Dr. Baetiong's testimony that respondent's home in Chicago is where her paranoia is the most dangerous and that, though alternatives from her friend's home to nursing homes were proposed, respondent had consistently insisted on returning to her own home. The court found that, therefore, hospitalization was the least restrictive alternative in this case.

We agree with the trial court and hold that there was no manifest error here. Our review of the evidence presented at trial clearly supports the court's conclusion that continued

hospitalization was the least restrictive alternative for respondent. See, *e.g.*, <u>Lisa G.C.</u>, 373 Ill. App. 3d at 596 (trial court's finding that commitment was least restrictive alternative was proper where doctor so testified and opined that the respondent " 'might very well act aggressively and violently to protect' " someone due to delusions and paranoia); <u>Tommy B.</u>, 372 Ill. App. 3d at 689 (where doctor testified that options other than hospitalization were considered but concluded not to be proper in light of the respondent's behavior, trial court's determination that hospitalization was least restrictive alternative was not against manifest weight of evidence); <u>Bert W.</u>, 313 Ill. App. 3d at 798 (same, where doctor testified that less restrictive alternative to hospitalization would be inappropriate because the respondent may become physically aggressive and dangerous to others); <u>In re Long</u>, 233 Ill. App. 3d 334, 341-42 (1992) (medical expert's testimony that hospitalization was least restrictive alternative sufficiently demonstrated that there was no alternative treatment other than hospitalization); see also <u>Todd K.</u>, 371 Ill. App. 3d at 543 (where the respondent's medical records and doctor's opinion showed he had a history of involuntary admissions and violence, had recently been acting aggressively and was noncompliant in taking prescribed medication, State met burden of proving that hospitalization was least restrictive alternative).

CONCLUSION

Accordingly, for all the foregoing reasons, we affirm the judgment of the trial court.

Affirmed.

O'MARA FROSSARD, J., concurs.

TULLY, J., dissents.

23

No. 1-06-1956

Justice TULLY dissenting:

I respectfully dissent from the majority's opinion, which required respondent-appellant, Hannah E. to be involuntarily confined at Chicago Read Mental Health Center. The facts stem from prior court cases which resulted in the confinement of respondent at Chicago Read Mental Health Center. Most of the events transpired on respondent's first involuntary commitment, which was affirmed by this court in In re Hannah E., 372 Ill. App. 3d 251, 259-60 (2007). In essence, this case involves a longstanding feud dating back to at least 1988 with a City of Chicago alderman, who had received complaints about the condition of Hannah's property. It is to be noted that this neighborhood was a community where teardown and construction of new buildings was occurring. Apparently, respondent had various animals in her Chicago home, and the City of Chicago had sent Mae Wormely, employed at the Animal Care Control, to remove the multitude of animals. The majority notes that respondent threatened Wormely after Wormely entered her home to remove the animals, as well as the alderman's aide. However, statements made in frustration do not significantly support involuntary commitment based on harm. See In re Schumaker, 260 Ill. App. 3d 723, 726-29 (1994). Here, respondent's threat was nothing more than an empty threat spoken out of frustration for having her home intruded upon and her animals taken away. Respondent has never attempted to carry out her threats or even begun to act upon them. As Dr. Sharpe noted, if respondent were "inclined to inflict serious harm on somebody she certainly had plenty of time" in the month and a half subsequent to the threat to Wormely and the aide.

The majority also discusses respondent's statement that she owns three guns. They

24

concluded that she's suffering from mental illness, and place significant reliance on respondent's statement that she owns three guns allegedly kept in a suburb, but not within Chicago's limits. Following a "very thorough" search where every piece of furniture was moved, and every drawer, bag, and box were inspected, two guns were found in respondent's Chicago home, but no third gun. Although only two of the three guns were found, it could be posited that if a person is mentally ill, these statements perhaps are the result of mental illness and therefore, not reliable. As such, it is possible that only two guns existed all along. Furthermore, Dr. Sharpe testified that he did not see how the "presence or absence of this weapon is really an issue as far as her risk to anybody else." Dr. Sharpe further testified that the missing third gun was unimportant in that respondent had never been known to brandish a gun, threaten anyone with a gun, or fire a gun at anyone.

Also discussed was an incident which occurred on April 6, 2006, after a second involuntary commitment petition was filed and later dismissed because respondent signed an application for voluntary admission. Respondent again stayed at Chicago Read Mental Health Center where during the 180 or so days she was there, a scratching incident occurred where a technician grabbed her hand in the process of initiating a body search, whereupon they forced her to the floor to restrain her. The scars the technician suffered, which the majority emphasized, resulted from scratches that were bandaged for only 48 hours, did not require time off from work, and were apparently resulted in "two little marks" on his wrist. This alleged attack was in fact no more than a minor incident in the course of an interaction between staff and patient. As Dr. Sharpe explained, the injury the technician suffered while restraining Respondent was likely the

25

"by-product of that particular procedure not necessarily as a result of something the patient deliberately did."

Furthermore, respondent visited an animal control facility where her animals were being held and spoke with Anne Kent. Ms. Kent was advised to notify police if respondent visited, and did so. Although Ms. Kent did not remember the circumstances of respondent's visit, respondent did not cause any harm or make any threats, and eventually left in her vehicle before police arrived. This is further evidence that respondent does not present any threat to herself or anyone else, and is not violent or threatening so long as she is not being restrained or is having her house intruded upon.

The majority largely relies on Dr. Baetiong's testimony recommending the respondent be involuntary committed. When asked as to whether it was reasonable to believe that respondent may harm others in the future, Dr. Baetiong responded that, "[i]t is very possible. I cannot guarantee one hundred percent that she can be - she cannot hurt anyone." However, her opinion was at most supported by her 7-month old threat to Wormely and the alderman's aide, which were made in frustration, the allegedly missing third gun, and the incident where respondent scratched a technician while being restrained. All of these factors are surrounded by circumstances raising doubt as to their support regarding respondent's involuntary commitment. Furthermore, it should be noted that had committed no harm whatsoever in her 57 years of living within the community. Considering the circumstances and facts of all the situations, it is questionable whether the judgment was not against the manifest weight of the evidence.

As to the 15-day period allowed for continuances, Section 3-800(b) of the Mental Health

No. 1-06-1956

and Developmental Disabilities Code (Code) (405 ILCS 5/3-800(b) (West 2004)) requires and mandates that no continuances on hearings beyond 15 days can be allowed.  I must disagree to the extent that the majority found that respondent had waived the issue on appeal.  Although respondent did not specifically object to the issue of timeliness, these continuances were objected to when they were requested.  Vital issues of freedom are inherent in these hearings and such continuances make light of the entire procedure.  The Code's procedural safeguards are not mere technicalities, but "tools to safeguard the liberty interests of respondents in mental health cases." In re Nancy A., 344 Ill. App. 3d 540, 549 (2003).  As such, these procedural safeguards should be strictly construed in favor of respondent.  Nancy A., 344 Ill. App. 3d at 550.

After reviewing this case, I cannot agree with the majority in finding that the manifest weight of the evidence showed clear and convincing evidence that the respondent was poised to inflict serious harm upon herself or others.  Respondent is an individual who has had her home and liberty taken away from her for far longer than justified by the law.  In consideration of the evidence, circumstances, and nature of respondent's mental illness, I do not believe that she is the sort of person that must remain involuntarily committed for the length of time she has been.