**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 180621-U

Order filed March 5, 2021

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| *In re* MARY T., a Person Found Subject to Involuntary Admission | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois. |
| (The People of the State of Illinois, | ) ) | |
| Petitioner-Appellee, | ) ) | Appeal No. 3-18-0621 Circuit No. 18-MH-201 |
| v. | ) ) | |
| Mary T., | ) ) | The Honorable Alicia N. Washington, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE DAUGHERITY delivered the judgment of the court.
Justices Lytton and Wright concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:  In an appeal in a mental health case, the appellate court found that: (1) the capable of repetition exception to the mootness doctrine applied to the respondent's appeal; (2) the trial court did not err in denying respondent's request to represent herself in the proceedings; and (3) the trial court did not err in ordering that respondent be transferred from the private hospital to the state mental health center for treatment.  The appellate court, therefore, affirmed the trial court's judgment.

¶ 2 A hospital nurse filed a petition in the trial court seeking to involuntarily admit respondent, Mary T., to a mental health facility on an inpatient basis for treatment. After conducting hearings, the trial court granted the petition. Respondent appeals, arguing that the trial court erred in: (1) denying respondent's request to represent herself in the proceedings; and (2) ordering that respondent be transferred from the private hospital to a state-operated facility for treatment. We affirm the trial court's judgment.

¶ 3 I. BACKGROUND

¶ 4 Respondent was a 68-year-old woman with a history of mental health problems. She had been hospitalized six times in the past for mental health concerns: once in 2008; once in 2011; three times in 2017; and one time in 2018, a few weeks before her hospitalization in the instant case. In addition to her mental health problems, respondent also had asthma and a seizure disorder. Despite her health and mental health problems, respondent had been able to live on her own in an apartment with the help of a home-care aide and had been able to manage her own finances, including the money she received from her Supplemental Security Income check.

¶ 5 On August 31, 2018, respondent called 9-1-1 for medical help. When emergency personnel arrived, respondent was very confused, disorganized, and disheveled, and her apartment was a mess. Respondent was yelling and screaming and appeared to be delusional and paranoid. She was taken to the hospital emergency room for treatment but refused to have a medical workup conducted and was acting psychotic. Respondent was admitted to the hospital at that time.

¶ 6 Almost three weeks later, on September 18, 2018, a nurse at the hospital filed the instant petition to involuntarily admit (also referred to as involuntarily commit) respondent. Attached to the petition were various supporting documents, including two certificates of examination and a

2

treatment plan for respondent. One of the certificates of examination had been completed by a licensed clinical social worker; the other had been completed by respondent's treating psychiatrist at the hospital, Dr. Jayalakshmi Attaluri. The petition and supporting documents essentially alleged that: (1) respondent was a person with a mental illness; and (2) unless respondent was immediately hospitalized and treated on an inpatient basis, she would be a danger to herself and others, would be unable to provide for her basic physical needs, and would suffer mental and emotional deterioration because respondent had a history of mental illness, had numerous prior mental health hospitalizations, had a long history of non-compliance with medication, had ongoing paranoid and delusional thoughts, had been acting verbally and physically aggressive toward hospital staff members and peers, had severely impaired judgment and insight, had been unable to care for herself at home, and had been coming to the hospital's emergency department for simple concerns.

¶ 7     On September 25, 2018, the trial court held a hearing on the involuntary commitment petition. Respondent was present in court for the hearing and was represented by an attorney that had been appointed for her from the Illinois Guardianship and Advocacy Commission. At the outset of the hearing, respondent indicated to the trial court that she wanted to represent herself in the proceeding. The following conversation ensued:

> "THE COURT: Okay. So, you want to represent yourself, is that what you're saying?
>
> [RESPONDENT]: That's what I wanted to do in the first place.
>
> THE COURT: Let me ask you a series of questions. ***.
>
> ***

3

THE COURT: Thank you.  Ms. [Respondent], tell me a little bit about yourself.  Tell me about your education okay, ma'am?

[RESPONDENT]: My education was when I was little I went to a gifted school.

THE COURT: Okay.  Where?

[RESPONDENT]: It was Lincoln school.  It was, the principal was a Holmes.  Thomas Holmes.  He had a wife.  Mrs. Holmes.

THE COURT: After that?

[RESPONDENT]: Didn't really know her first name.

THE COURT: After that, where did you go?

[RESPONDENT]: After that, I went to Roosevelt.

THE COURT: Okay.  After that?

[RESPONDENT]: I went, also, too, because we had a fire at the house.  I had to go, transfer into a different territory.  So, I went to Woodruff.

THE COURT: Okay.  And you finished Woodruff High School, correct?

[RESPONDENT]: I didn't finish these high schools because this was, because we had fires.  We moved.  When our house was fixed, we moved back.

THE COURT: Okay.  After going to Woodruff, did you start working?  Is that what happened?

[RESPONDENT]: I went to Manual.

THE COURT: Then you went to Manual.  Did you graduate from Manual?

4

[RESPONDENT]: Yes, I did.

THE COURT: Then what?

[RESPONDENT]: I would like to clarify that. I went to work when I was very young. When I was four years old, I went and I cleaned for eleventh, but the police also asked me to tell them anything that was going on that was out of the ordinary in that household.

THE COURT: Ms. [Respondent], you can read and write the English language?

[RESPONDENT]: Yes, I can.

THE COURT: You understand that today the person seated to your left is a trained attorney? Throughout this process, he will be asking questions, a series of questions. This is about your liberty. Do you understand that?

[RESPONDENT]: I'm not worried about it because I took law.

THE COURT: Where did you take law?

[RESPONDENT]: I took law when I was in the gifted school. I took law when I was in Manual High School. I also took business law. I took constitution law.

THE COURT: When is the last time you worked?

[RESPONDENT]: When was the last time I worked?

THE COURT: Yes.

[RESPONDENT]: I volunteered to go back to work when they had a program two years ago. That would be in 2016. I asked McFarland, not 2016. This is '18. It was 2016 I asked—McFarland Braggs had a program where you

5

could ask for help with your life, but if you thought you were qualified to work you could volunteer to work. So, I volunteered to work which meant they would have to train me to work.

It was civil work I did at city hall. I felt I could do it. Pat Quinn was in office and Pat Quinn wrote a letter back. He said that I was too old for them to train at that particular point in time. I was 66."

¶ 8 After the trial court finished questioning respondent, it denied respondent's request to represent herself. In so doing, the trial court stated:

"At this time, the Court has found that I am going to make sure that you have an attorney represent you throughout this process. So, with that being said, one of the things the Court was doing, Ms. [Respondent], I had to listen to some of the information provided. I understand you stated to the Court that at Lincoln Middle School, Lincoln School you had law classes and you also had business law.

I do believe at this time the Court finds it's in your best interest to have an attorney represent you. With that being said, please, proceed, Counsel."

¶ 9 The hearing went forward, and the State called Dr. Attaluri to the witness stand as its only witness. Attaluri testified about her background and experience and about her interactions with, and evaluation of, respondent. In addition to providing much of the information that has already been sent forth above, Attaluri testified at the involuntary commitment hearing that respondent was currently being housed in the senior behavioral unit of the hospital, a locked-down unit where persons who were over 65 years old who had psychiatric or mental health issues were admitted for safe and secure inpatient care. Attaluri's current diagnosis for

6

respondent was that she suffered from psychotic disorder unspecified. According to Attaluri, respondent was having paranoid thoughts and delusions and thoughts of accusing people of assaulting and raping her. Respondent initially refused to eat at times and would usually remain in her room. Respondent believed that if anyone touched her, her bed, or her walker, that she would be contaminated by that person's germs. In addition, if anyone tried to encourage respondent, she would become very aggressive and threatening, would be verbally abusive, and would yell and scream at that person.

¶ 10 During her current admission (and prior admissions), respondent would refuse to talk to Attaluri and would turn away as soon as Attaluri entered the room. When Attaluri would try to evaluate or examine respondent, respondent would ask Attaluri to leave. No matter what approach Attaluri would take, respondent would start yelling and screaming at Attaluri and would call Attaluri names. On a couple of occasions, respondent got up out of her bed or chair and started to move toward Attaluri, and Attaluri had to leave respondent's room and shut the door because she felt that respondent was going to physically attack her. Attaluri continued to try to talk to respondent at the hospital because Attaluri felt that she had an obligation to offer her services to respondent and to try to explain to respondent why respondent was in the hospital and what treatment she was proposing for respondent. Attaluri believed that respondent's aggressive behavior was the result of respondent's mental illness.

¶ 11 Attaluri had been involved in respondent's three prior hospital admissions in 2017. She did not know if respondent had been compliant with her medications in the past but indicated that respondent had been taking her current medications at the hospital. Attaluri had noticed that since respondent had been taking the medications, respondent was a little better with some of the other staff members and had started coming out of her room more.

¶ 12        When asked for how long of a period of time she expected respondent to be admitted, Attaluri stated that she was asking for a transfer to the state mental health center because respondent needed the consistent, long-term care that such a facility could provide, as compared to a private hospital, which only provided treatment for acute problems. In a state facility, respondent could stay for a longer period of time, could have different services and guardianship considered, and would have much-better-coordinated outpatient services with follow-up care. In addition, Attaluri believed that respondent should eventually be discharged into an assisted-living environment and should show for a period of time that she was ready for independent living, before she would be released to an independent-living environment. In her testimony, Attaluri noted that during a prior admission in 2017, respondent was discharged to a nursing home but took a taxi back to the hospital the following day and was readmitted. In addition, in respondent's prior 2018 admission, she was given outpatient follow-up care. According to Attaluri, respondent's repeated hospital admissions were not helping respondent to stabilize enough.

¶ 13        Respondent testified in her own behalf at the hearing and provided some of the information that has already been set forth above. Portions of respondent's testimony were difficult to follow. We need not elaborate on that here, however, since respondent has not challenged the trial court's ruling to involuntarily commit her.

¶ 14        In closing argument at the involuntary commitment hearing, respondent's attorney opposed the transfer of respondent from the private hospital to the state mental health facility, stating that such a transfer was not necessary since respondent had been "progressing nicely" at the hospital.

¶ 15    At the conclusion of the hearing, the trial court granted the involuntary commitment petition, finding by clear and convincing evidence that: (1) respondent suffered from a mental illness, psychotic disorder unspecified; (2) because of her mental illness, respondent was reasonably expected to engage in conduct that would place herself or others in danger of physical harm; (3) as a result of her mental illness, respondent was unable to provide for her basic needs; (4) it would be very difficult for respondent at the current time to proceed in an organized manner in the community; and (5) respondent would have difficulty organizing her thoughts and providing for her basic care. The trial court ordered that respondent be involuntarily committed for a period of up to 60 days. In addition, the trial court initially ordered that respondent be transferred to the state mental health facility for treatment. However, after a recess was taken, the trial court stated that it was going to hold the issue of the transfer over until the following week and that it would hear further information on the matter at that time.

¶ 16    On October 2, 2018, the trial court held a further hearing on whether respondent should be transferred to the state mental health center. At the outset of the hearing, respondent's attorney represented to the court that the Office of the State Guardian did not believe that a state guardian was needed for respondent because a state guardian would not be able to assist respondent with her daily needs. Turning to the issue of the transfer, the State reiterated its prior position that respondent should be transferred to the state mental health center due to her psychosis and that there was no more appropriate place for respondent to go for treatment at that time. Respondent's attorney stood on his prior argument that a transfer to the state mental health center was unnecessary and that respondent should be discharged back to her home as soon as she became stabilized on medication.

¶ 17    On its own motion, the trial court had Dr. Attaluri take the witness stand for some additional questions. The trial court asked Attaluri how long it would take for the transfer to occur. Attaluri responded that the social workers had already been in contact with the state mental health center and that the transfer would take place in the next two or three days if a bed was available at the center. Based upon that information and the other information that had previously been presented, the trial court granted the transfer request.

¶ 18    On October 8, 2018, respondent filed her notice of appeal. The following day, the state mental health center notified the hospital by letter that respondent did not meet the criteria for admission into the center due to her age, medical condition, and inability to ambulate independently. The record does not indicate where respondent was ultimately placed for the remainder of the 60-day period.

¶ 19                                II. ANALYSIS

¶ 20              A. Capable of Repetition Exception to the Mootness Doctrine

¶ 21    On appeal, respondent argues that the trial court erred in: (1) denying respondent's request to represent herself in the proceedings; and (2) ordering that respondent be transferred from the private hospital to the state mental health center for treatment. We will address each of those issues in turn.

¶ 22    Before we do so, however, we must first determine whether there is an exception to the mootness doctrine that would apply in this case that would allow us to reach the merits of the parties' arguments on appeal. The involuntary commitment of respondent was limited to a period of 60 days and has long since ended. Thus, there is no question—and no dispute between the parties—that the underlying issues are now moot. See *In re J.T.*, 221 Ill. 2d 338, 349-50 (2006) (indicating that an appeal is moot if it presents no actual controversy or if the issues

10

involved in the trial court no longer exist because intervening events have made it impossible for the reviewing court to grant effective relief to the complaining party); *In re Alfred H.H.*, 233 Ill. 2d 345, 350-51 (2009) (recognizing that the underlying question of whether an involuntary commitment order was valid was moot because the time period during which the order was in effect had long since passed and the respondent could not be held involuntarily unless a new petition was filed and a new hearing conducted). It is well established, however, that issues raised in an appeal that are capable of repetition yet evade review because of the short duration of the trial court's order fall under an exception to the mootness doctrine. See, *e.g.*, *In re Kurtis C.*, 2015 IL App (3d) 130605, ¶¶ 15-19 (applying the capable of repetition exception in an appeal in an involuntary medication case); *In re Michael F.*, 2011 IL App (5th) 090423, ¶ 19 (applying the capable of repetition exception in an appeal in an involuntary commitment case).

¶ 23    The parties both assert that the capable of repetition exception should be applied in this case since respondent has a long history of mental health hospitalizations and will likely be subject to involuntary commitment proceedings in the future. We agree. See *Kurtis C.*, 2015 IL App (3d) 130605, ¶¶ 15-19; *Michael F.*, 2011 IL App (5th) 090423, ¶ 19. We will, therefore, address the merits of the parties' arguments on appeal.

¶ 24                                    B. Self-Representation

¶ 25    As her first point of contention on appeal, respondent argues that the trial court erred in denying her request to represent herself in the proceedings. Respondent asserts that in making its ruling, the trial court failed to comply with section 3-805 of the Mental Health and Developmental Disabilities Code (Mental Health Code) (405 ILCS 5/3-805 (West 2018)), which required the trial court to determine whether respondent lacked the capacity to waive counsel.

11

Instead, respondent maintains, the trial court applied an impermissible best interest standard. Based upon that alleged error, respondent asks that we reverse the trial court's judgment.

¶ 26    The State argues that the trial court's ruling was proper and should be upheld. The State asserts that the record clearly shows that the trial court conducted a proper and thorough inquiry of respondent—which included questions about respondent's education, intelligence, legal background, work experience, and her understanding of the nature of the hearing and of the basic purpose of counsel—and determined that respondent lacked the capacity to make an informed waiver of her right to counsel. In making that assertion, the State acknowledges that the trial court did not specifically refer to respondent's capacity to waive counsel but asserts, nevertheless, that the trial court did not apply the impermissible best interest standard that respondent suggests. According to the State, the trial court was not required to use specific words, make formal findings of fact, or provide a statement of reasons for its decision, as long as the trial court made a sufficient record of its inquiry to allow for meaningful review of its exercise of discretion—which the State maintains that the trial court did in the present case. For all of the reasons set forth, therefore, the State asks that we affirm the trial court's judgment.

¶ 27    The determination of whether a respondent in an involuntary commitment proceeding has the capacity to waive the right to counsel is a matter that is within the discretion of the trial court and will generally not be reversed on appeal unless the trial court has abused its discretion. *In re Lawrence S.*, 319 Ill. App. 3d 476, 481 (2001). However, in this particular case, the question before us is not whether the trial court abused its discretion in making its determination but whether the trial court complied with the terms of the statute and the standard set forth in the statute. Statutory compliance is a matter that is subject to a *de novo* standard of review on

12

appeal. *In re Tiffany W.*, 2012 IL App (1st) 102492-B, ¶ 10. Therefore, we will apply a *de novo* standard of review in resolving this issue.

¶ 28        The involuntary provision of mental health services causes a massive curtailment of a person's liberty. *In re Barbara H.*, 183 Ill. 2d 482, 496 (1998); *Michael F.*, 2011 IL App (5th) 090423, ¶ 21. The Mental Health Code, therefore, gives all persons alleged to be subject to involuntary commitment the right to be represented by counsel. 405 ILCS 5/3-805 (West 2018); *Michael F.*, 2011 IL App (5th) 090423, ¶ 21. The right to counsel is a central feature in the procedures enacted by our legislature to ensure that Illinois citizens are not improperly subjected to the involuntary provision of mental health services. *Barbara H.*, 183 Ill. 2d at 496; *Michael F.*, 2011 IL App (5th) 090423, ¶ 21. A respondent in a mental health proceeding may waive the right to counsel only if the trial court is satisfied that the respondent has the capacity to make an informed waiver of that right. 405 ILCS 5/3-805 (West 2018); *Kurtis C.*, 2015 IL App (3d) 130605, ¶¶ 23-24.

¶ 29        When a respondent in a mental health proceeding indicates that he wants to represent himself, the trial court is obligated to determine whether the respondent has the capacity to make an informed waiver of the right to counsel. 405 ILCS 5/3-805 (West 2018); *Kurtis C.*, 2015 IL App (3d) 130605, ¶¶ 24, 26. In making that determination, the trial court must inquire about the respondent's mental ability, intelligence, and understanding of the basic purpose of counsel and must make certain that the respondent has the educational or legal background necessary to represent himself. *Kurtis C.*, 2015 IL App (3d) 130605, ¶¶ 24, 26; *Michael F.*, 2011 IL App (5th) 090423, ¶ 23. "At the very least, the trial court should ask a few questions requiring answers that would show whether the respondent has a basic understanding of what the hearing is about and the role of counsel." *Michael F.*, 2011 IL App (5th) 090423, ¶ 23.

13

¶ 30        In the present case, after having reviewed the record, we find that the trial court applied the proper statutory standard in determining whether to allow respondent to represent herself in the proceedings. See 405 ILCS 5/3-805 (West 2018); *Kurtis C.*, 2015 IL App (3d) 130605, ¶¶ 24, 26; *Michael F.*, 2011 IL App (5th) 090423, ¶¶ 21-23. Before making its decision, the trial court questioned respondent about her level of education, her intelligence, her familiarity with the law, her work experience, and her understanding of the proceedings and the role of an attorney in those proceedings. After obtaining that information and having the opportunity to observe respondent as she answered the court's questions, the trial court made its ruling and denied respondent's request to represent herself in the proceedings. The statute requires nothing more of the trial court. See 405 ILCS 5/3-805 (West 2018); *Kurtis C.*, 2015 IL App (3d) 130605, ¶¶ 24, 26; *Michael F.*, 2011 IL App (5th) 090423, ¶¶ 21-23. That the trial court made a brief reference to respondent's "best interest" does not persuade us to reach the opposite conclusion since the record in this case clearly shows that the trial court followed the proper procedure as established by the statute and the case law interpretations of the statute. See 405 ILCS 5/3-805 (West 2018); *Kurtis C.*, 2015 IL App (3d) 130605, ¶¶ 24, 26; *Michael F.*, 2011 IL App (5th) 090423, ¶¶ 21-23. We, therefore, affirm the trial court's ruling, denying respondent's request to represent herself in the proceedings.

¶ 31                         C. Transfer to the State Mental Health Center

¶ 32        As her second point of contention on appeal, respondent argues that the trial court erred in ordering that respondent be transferred from the private hospital to the state mental health center for treatment. Respondent asserts that the trial court wrongfully ordered disposition to the state mental health center without any evidence being presented that the state mental health center was appropriate for, available to, and designated by the Department of Human Services

14

(DHS), as a disposition for respondent. In making that assertion, respondent points out that the State presented no testimony from the DHS or from the state mental health center regarding the appropriate placement. In addition, respondent maintains, the treatment plan, which was the only portion of the predisposition report that was filed with the court, contained no information about the state mental health center or any other alternative disposition. For all of the reasons stated, respondent asks that we reverse the trial court's judgment.

¶ 33    The State argues that the trial court's ruling was proper and should be upheld. The State asserts that the trial court correctly found, based upon the evidence before it at the hearings, that the state mental health center was appropriate and the least restrictive alternative for respondent. The State asks, therefore, that we affirm the trial court's judgment.

¶ 34    As with the previous issue, this issue also presents a question of whether the trial court complied with the requirements of the statute. We apply a *de novo* standard of review to such a question on appeal. See *Tiffany W.*, 2012 IL App (1st) 102492-B, ¶ 10.

¶ 35    After the trial court determines that an individual respondent is subject to involuntary admission, it must then determine the appropriate disposition for that respondent (the specific place to which respondent will be committed). See 405 ILCS 5/3-810, 3-811 (West 2018); *In re James H.*, 405 Ill. App. 3d 897, 905 (2010). Section 3-810 of the Mental Health Code requires the facility director or such other person as directed by the trial court to file a predisposition report with the court in involuntary admission cases. 405 ILCS 3/810 (West 2018). The report must be in writing and must include information on the appropriateness and availability of alternative treatment settings, a social investigation of the respondent, a preliminary treatment plan, and any other information the trial court may order. *Id.* The trial court must consider the report in determining the appropriate disposition. *Id.* In addition, if the respondent is going to be

15

treated on an inpatient basis, the trial court must also consider "alternative mental health facilities which are appropriate for and available to the respondent, including but not limited to hospitalization." 405 ILCS 5/3-811(a) (West 2018). The trial court may order the respondent placed in a state-operated mental health facility if the facility has been designated by the DHS. *Id.* The trial court's selection, however, must be the least restrictive treatment alternative that is appropriate for the respondent. See *id.*

¶ 36       In the present case, at the time of disposition, the trial court had before it the involuntary commitment petition, the examination certificates in support of commitment on an inpatient basis, the treatment plan, the testimony of respondent's treating psychiatrist, and the testimony of respondent. The information before the trial court showed that: (1) respondent had a long history of mental illness, mental health hospitalizations, and noncompliance with medications; (2) respondent was currently unable to function in her home setting and repeated hospitalizations had not been sufficient to stabilize respondent; (3) a state guardian was not an appropriate option for respondent because a state guardian would not be able to assist respondent in her daily needs; (4) respondent had previously been discharged to a nursing home and given outpatient care but ended up returning to the hospital for readmission; (5) respondent was in need of the consistent and longer-term treatment that could be provided at the state mental health center but could not be provided at the private hospital; and (6) respondent could be transferred to the state mental health center for treatment within a few days if a bed was available. After considering that information, the trial court determined that a transfer to the state mental health center was the appropriate disposition for respondent. Although the trial court did not make a specific finding that treatment at the mental health center was the least restrictive alternative, such a finding was not required under the law. See *James H.*, 405 Ill. App. 3d at 905 (indicating that the trial court

16

is not required to make a specific finding that a certain treatment is the least restrictive alternative). The record before the trial court—specifically the information set forth above—provided a sufficient basis for the trial court to determine that the mental health center was the least restrictive alternative. See *id.* (stating that the trial court's ruling is proper if the record provides the basis for the trial court to determine that involuntary hospitalization is the least restrictive alternative for the respondent); *In re Robert H.*, 302 Ill. App. 3d 980, 988 (1999) (indicating that testimony may qualify as an adequate substitute for a predispositional report, unless the respondent objects to the lack of a written report during the proceedings). That the state mental health facility later declined to accept respondent as a patient does not change our conclusion here as the trial court was tasked with making its determination based upon the information that was available at the time. We, therefore, affirm the trial court's ruling, which directed that respondent be transferred from the private hospital to the state mental health center for treatment.

¶ 37                                III. CONCLUSION

¶ 38        For the foregoing reasons, we affirm the judgment of the circuit court of Peoria County.

¶ 39        Affirmed.